## LAU FOOK KAU v. UNITED STATES.

Circuit Court of Appeals, Ninth Circuit. July 29, 1929.

No. 5591.

Russell P. Tyler, of San Francisco, Cal., for appellant.

Sanford B. D. Wood, U. S. Atty., and Charles H. Hogg, Asst. U. S. Atty., both of Honolulu, Hawaii, and George J. Hatfield, U. S. Atty., and George M. Naus, Asst. U. S. Atty., both of San Francisco, Cal., for the United States.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge. The appellant was convicted of sending an obscene letter through the United States mails. The portion of the letter charged to be obscene is set forth in English in the indictment. It was directed to Post Office Box No. 2034, Honolulu, T. H. This post office box was used by the Liberty News, a newspaper of which Siu Chin Tai was president. The letter was anonymous, and contained no address for reply. The allegation in the indictment alleged that "said letter was obscene, lewd, and lascivious, in that said letter contained the following language: 'I also ask whether the wife of Siu Chin Tai can accommodate us to-night throughout the night. If willing we will compensate her five dollars ($5.00) American money for one time. Altogether there are twelve (12) of us who can take turn twelve (12) times; total receipts sixty dollars ($60.00).' "

A letter attempting to arrange such an assignation is clearly within the statute prohibiting the mailing of obscene, lewd and lascivious matter. U. S. v. Martin (D. C.) 50 F. 918; Parish v. U. S. (C. C. A. 4) 247 F. 40; U. S. v. Moore (D. C.) 129 F. 159, both cited with approval in Krause v. U. S. (C. C. A. 4th( 29 F.(2d) 248, 252.

It appears from an examination of the entire case that the appellant was convicted for sending a letter entirely different in phraseology from that contained in the indictment. In the first place, there was a variance between the allegation and the proof, in that it was alleged in the indictment that the letter was in English, whereas the only proof was of a letter written entirely in

Chinese. The proper method of pleading would be either to set out the Chinese characters in the letter and to allege the English translation, or, as has been held in California in some Chinese cases, to allege that the letter was in Chinese and also allege the English translation of the Chinese letter. This was held in a forgery case. People v. Ah Woo, 28 Cal. 206. See, also, Stevens v. Kobayshi, 20 Cal. App. 153, 128 P. 419; People v. Ah Sum, 92 Cal. 648, 28 P. 680, in which it was held that a lottery ticket in Chinese, set up in the indictment, should have been translated in the indictment. A late California case, People v. Rizotto, 30 Cal. App. 616, 159 P. 199, held that there was a variance between pleading and proof, where the contents of a threatening letter were alleged in English and proof showed a letter written in Italian. To the same effect, see Blaser v. Krattiger, 99 Or. 392, 398, 195 P. 359; Grotius v. Ross, 24 Ind. App. 543, 57 N. E. 46; Kunz v. Hartwig, 151 Mo. App. 94, 131 S. W. 721, par. 4, page 723; Kerschbaugher v. Slusser, 12 Ind. 453.

The appellant did not at any time during the trial raise the question as to the variance between the allegation that the letter was in English and the proof offered was of a letter in Chinese. Without such objection this variance could not be taken advantage of by the appellant on appeal, but the appellant did throughout the case insist that the interpretation put upon the Chinese by the allegation of the indictment was entirely erroneous. The evidence, without any conflict whatever, establishes the fact that two Chinese symbols used in the letter and interpreted in the indictment as "wife" was the Chinese word "karkim." The testimony of all the witnesses is to the effect that these words or symbols mean "family." The testimony also, without conflict, established the fact that there is no word in the Chinese letter which is or corresponds to the pronoun "her," used in the second sentence of the translation. If we substitute for the word "wife" in the translation the word "family" and strike out the word "her," the character of the letter is entirely changed.

The Chinese interpreter, who translated into English the Chinese testimony given during the trial, translated the letter as follows: "Siu Chin Tai and family. To help me one night, to-night. If you are willing to help us out at five dollars one time gold, United States gold, one time. We got twelve men. We could use twelve times. That is sixty dollars." This translation was placed before the court and jury by having the witness, Siu Chin Tai, read the letter in Chinese and the court interpreter translate it into English.

In similar fashion the witness Yong Tai Tong, whose testimony was translated to the court and jury by the same Chinese interpreter who interpreted the testimony of Siu Chin Tai, was asked to tell the meaning in Chinese to the interpreter, the interpreter to translate the meaning of the letter in English as given in Chinese by the witness. The witness did not understand English. Counsel for the defendant stated, "There are words there, and he understands the meaning, and he can give them to the interpreter." To this suggestion the court replied, after argument, "Well, let's go ahead and see how far this thing goes."

The witness talks in Chinese. The interpreter begins to interpret as follows:

"A. We all ask—" Whereupon the court interrupts: "That is what you say, Mr. Interpreter. Now I want to know what you say.

"A. This thing altogether ask, all as one ask Siu Chin Tai's family, home and people living around there, to-night, to-night possible, help us, a bunch, one night. If you willing we give you United States money five dollars one time. We have twelve men altogether. Can you help us? Each one time. twelve times, total to sixty dollars."

The court then interrogated the witness, through the interpreter, as follows:

"Q. You have read that off there. What is it, five dollars for what—dancing at a Chinese dance, or singing a Chinese song, or standing on your head, what is it about? What is the five dollars for, and the sixty dollars, what does it mean? A. Nothing at all.

"Q. It means nothing at all, is that it? A. Yes.

"Q. In other words, it may mean inviting Siu Chin Tai's family, wife and family, to go on an automobile ride with twelve men, one every time, five dollars apiece; that is, according to your idea? Is that right? A. It does not say 'automobile' or anything.

"Q. Does that mean, is that an invitation for Siu Chin Tai's wife to indulge in unlawful sexual intercourse or relations for five dollars a time? A. Simply says 'to help us out.'

"Q. Does that mean help you out sexually, or what? A. It does not say that.

"Q. Could it mean that? A. It has not got those two words there.

"Q. Does it mean anything? A. It does not mention any sexual intercourse or any idea about it; I could not say offhand.

"A Juror: "If you got a letter like that, the same wording that is on that paper there, from somebody else, would it make you mad, or wouldn't it make you mad? A. No; I would not think anything about it.

"Q. You would think it was a perfectly proper letter, one that would ordinarily go through the mail from one friend to another? A. Yes.

"Q. What would he understand that it meant? A. I do not understand what the contents is.

"Q. You would think that the man who wrote it was a little bit off? A. Yes, I think he is crazy.

"The Court: Q. Suppose it is a fact that he did not sign his name; would that help you out in figuring out what he meant by it? A. Yes.

"Q. All right, now there is no name there, is there? A. No, not on this side.

"Q. On that side there is no name. Would that help you out as to what he meant by writing that 'five dollars one time, twelve people sixty dollars'? A. Because really I do not know what this man is driving at.

"Q. You don't know what the letter is driving at? A. Yes; there is nothing there to say anything about it.

"Mr. Le Baron: Q. One of the reasons that the letter is such a mystery, and hard to tell what it is driving at, is because there is no subject-matter; is that so? A. Yes.

Mr. F. E. Stafford, called as a witness by the defendant, a teacher of the Chinese language in the Honolulu high school, who had been studying Chinese for 18 years and had lived in China for 6 years and studied the Chinese language in a regular Chinese language school, where business men and missionaries studied the language, interpreted the letter as follows:

"Also ask Siu Chin Tai, your family, to-night, can possibly accommodate us for one night or not. If so and you are willing to promise, our price is in American money five dollars one time. We, altogether, are twelve persons. We can take turns, twelve times, making a total obtainable of sixty dollars."

He stated that the word "karkim" was translated in all the dictionaries that he looked up as "wife and family," and stated that the usual meaning of the word was "family." During the cross-examination the court interrogated the witness as follows:

"The Court: Will you hold that document in your hand and refer to the part you translated there, and see if you find this in there: 'I also ask whether the wife of Siu Chin Tai can accommodate us to-night throughout the night.' Can you find that there? A. It does not say that.

"Q. Can it be translated to that extent? Can that meaning be given to it? 'I also ask whether the wife of Siu Chin Tai can accommodate us to-night'? A. I think that you would be stretching the translation to give that to it.

"Q. The context—you said the word 'accommodate' is there; taking that whole document, could you translate that document so it would be this: 'I also ask whether the wife of Siu Chin Tai can accommodate us to-night throughout the night.' A. I don't think I can qualify as a judge of these inner meanings, the secondary meaning, rather. I know the character meaning of the word. I would hesitate to say.

"Q. Is there anything about that which may have a secondary meaning? A. There is; there is something in Chinese, something like the Hawaiian, there may be a meaning put in it; but I would hesitate to say what that meaning is.

"Q. You are familiar, then, with some Hawaiian. You know an Hawaiian prides himself on his ability to say something which may have two meanings; isn't that right? Now with that, is that susceptible of two meanings, the ordinary, common meaning, and susceptible to another meaning that may be just as correct as the first; could that exist in a document of that character? A. The Chinese scholars make a special point of being able to conceal their thought with nice words. That is a thing the Chinese scholars pride themselves on being able to do, to put across a message.

"Q. Do you call that a scholarly composition? A. No; it is just ordinary. The Chinese language is ambiguous. It is almost impossible to hold a contractor down to a contract; you will find some little technicality in the language, and he will crawl out of his obligations.

"Q. The indictment in this case says that this man did certain things in certain language: 'I also ask whether the wife of Siu Chin Tai can accommodate us to-night.' And I understand now, Mr. Stafford, you are unable to tell whether that hidden meaning can be taken from this? A. I would say that the letter does not say that. As to whether it was intended to convey that meaning, I don't think I am qualified—not qualified to state that he intended to convey that meaning. All I can say is that the letter does not say what the translation says, in my judgment.

"A Juror: From reading it, you can ar-

rive at your own conclusion as to what it is about? A. Yes; but I could not say what conclusion I will arrive at and what other conclusions may be arrived at. do not feel called on to say what conclusions can be arrived at."

The only witness in the case who substantiated the translations contained in the indictment was the witness S. K. Lau. He had furnished the district attorney with the translation interpreted in the indictment as a basis for the indictment, and, on being shown the English translation he had previously furnished the district attorney, stated it was a correct translation. On cross-examination, however, when he gave an extemporaneous and literal translation, he gave quite a different translation than that contained in the indictment, or in the English translation he had already testified to. His testimony was as follows:

"A Juror: May the witness translate that letter at the present time. A. Is it proposed that I translate it to the jury? I took hours to look at that letter. I give you the literal translation. I can give you only one. I can give— The first words mean, 'And ask Siu Chin Tai, wife, to-night, able to or not'— I am giving the literal translation—'accommodate us one night, yes or no, if willing, yes or no, we compensate American money, five dollars, one night. Altogether there are twelve of us, able to take turns for twelve times; total amount of receipts sixty dollars.' That is a literal translation.

"Q. So the entire meaning or idea of that message, Mr. Lau, depends and centers solely around the word 'karkim,' does it? A. I don't think so.

"Q. If that were not inserted in there, but 'family,' making it wives, daughters, possibly all the children, then there would be nothing wrong with that, would there?

"Mr. Moore: That is objected to, as asking the opinion of the witness, asking whether it is right or wrong.

"The Court: Objection sustained. All he has to do is translate what that is.

"Q. Aside from just the translation given me, there is no obscene word or lewd word in there, is there?

"The Court: That is a question this witness is not qualified on; that is for the jury."

The most damaging testimony is that of the complaining witness, Siu Chin Tai, testifying through an interpreter as follows:

"Q. You tell me, what is the meaning amongst the Chinese community, as you know it, for the word 'family,' as used in that translation? (referring to the above-quoted translation by the interpreter). A. That means my wife.

"The Court: Q. So that means to you that this letter asks you to let your wife accommodate these men at a certain stipend; is that it? A. Yes.

"Q. It conveys to you the idea; the word 'use' is sexual use? A. Yes; to sleep with them."

In this connection it will be observed that the word "use" is not contained in the translation set out in the indictment.

■ The interpretation put upon the writing by this witness was not material. The meaning of the letter must be determined from its context, and the court so instructed the jury, and so ruled in connection with the hereinabove quoted testimony of S. K. Lau. The statement of this witness that the word "family" meant "wife" to him is an illustration of the extent to which he was willing to go to put an evil interpretation upon the letter. It is obvious that the letter was not actually intended to solicit an assignation for two reasons: In the first place, the letter gives no facilities for an answer; it was posted at a time when an answer was impossible before the night referred to; and, second, Siu Chin Tai for more than two years had been an enemy of the appellant. It is obvious that, with this feeling of bitter hostility between them, to which they both testified, there is no expectation of a favorable reply to the proposition contained in the letter, if that proposition is correctly interpreted in the indictment. If the letter was written by the appellant, it was probably intended to insult his enemy rather than to provoke lewd and lascivious thoughts. The obscenity of the letter, however, is to be judged, not by the actual effect upon the recipient, but upon the character of the letter itself. One of the fundamental difficulties in this case is that many of the witnesses were Chinese. Their testimony was interpreted to the court and jury by the Chinese interpreter.

■ We must either accept his translation of the letter sent through the mail and upon which the indictment is based, or we must conclude that he was so far incompetent as an interpreter that his translation of the testimony of the witnesses concerning the meaning and character of the letter is also erroneous; indeed, it is clear that the case could not be tried properly without a competent interpreter. The fact that he was used in the trial without opposition or objection would justify us in accepting his interpretation of the letter. The letter as interpreted by him is not only in complete variance with the

translation in the indictment, but is of such a nature that the verdict of the jury based thereon could not be sustained on the theory that the letter was per se obscene. The instructions by the court to the jury left the matter entirely to the judgment of the jury, aside from the general instructions concerning the presumption of innocence and the weight of evidence as follows:

"I instruct you that the words 'lewd' and 'lascivious' mean that form of immorality which has relation to sex impurity.

"I instruct you that the writing need not use words which are in themselves obscene in order to be obscene. All that is necessary is that the idea conveyed by the words used in the writing be obscene, and in this connection I further instruct you that the word 'obscene' means that form of indecency which is calculated to promote the general corruption of morals."

"Gentlemen of the jury, if you find from all the evidence that the letter in issue is not obscene, lewd or lascivious or if you have any reasonable doubt thereof, you must acquit the defendant.

"Gentlemen of the jury, in determining the meaning of the letter in issue, if you find any ambiguity, uncertainty or obscurity in meaning you must take the meaning most favorable to the defendant, and if there is any word which can have two different meanings you must take the meaning most favorable to the defendant."

"You are not to convict the defendant on mere suspicion or because it is more probable that he is guilty than innocent; and in order to convict him you must believe the evidence to be true, not beyond all possible doubt, but beyond all reasonable doubt."

The jury were thus left to work out as best they could the proper translation of the Chinese letter, and then to determine whether or not it was an obscene letter. Under such circumstances, the testimony of the complaining witness, interpreting the word "family" to mean "wife," and his personal opinion as to the significance of the letter, must have led the jury to its verdict of guilty. It should be said, however, that the witness S. K. Lau insisted that the interpretation in the indictment was the only reasonable way of presenting in English the meaning of the Chinese.

There is still another difficulty in the case, namely, that the appellant was connected with the mailing of a letter solely by evidence as to his handwriting.

The appellant assigns the conduct of the judge who tried the case as so biased and prejudiced as to prevent a fair trial, and seeks a reversal on that ground; but the assignment is based on rulings and remarks by the trial judge during the trial, duly excepted to, and thus reviewable on appeal. We will proceed to a consideration of some of these rulings, which relate in the main to a restriction of cross-examination as to some witnesses, and to an adverse ruling as to the competency of one of the appellant's witnesses tendered as a handwriting expert. Both these matters are so largely in the discretion of the trial judge that they can only be reviewed where there has been a manifest abuse of discretion. The appellant desired to cross-examine the complaining witness as to the circumstances and causes of his enmity, and the court sustained an objection thereto, on the ground that, as the hostility was admitted, the reasons for their hostility were immaterial. There is respectable authority on both sides of the proposition as to the admissibility of such testimony. Stewart v. Kindel, 15 Colo. 539, 25 P. 990; State v. Collins, 33 Kan. 77, 5 P. 368. Contra, Stone v. Tupper, 58 Vt. 409, 5 A. 387; Langhorne v. Commonwealth, 76 Va. 1012; Kellogg v. Nelson, 5 Wis. 125; 40 Cyc. 2661, 2559.

It is sufficient for the purposes of this appeal to say that the appellant was permitted to show on cross-examination, not only the ultimate fact of the hostility of the complaining witness to him, but also that the difficulty between them grew out of political differences developed in an association to which both belonged; that both were national committeemen for the Chinese Cantonese government; and that the complaining witness had sued the appellant twice. Furthermore, the appellant had objected to evidence as to who started the difficulty or "argument," when asked by the prosecution on direct examination. Under these circumstances it was not error to sustain objections to a further development of the quarrel between the two, or to sustain an objection to a question calculated to elicit the fact that the appellant had started to form a rival newspaper.

We may dismiss the assignment of error and the exception reserved to the sustaining of objections to the qualification of a professional engraver to testify as to Chinese handwriting with the observation that there was no abuse of discretion in excluding the evidence of this witness.

The question of variance between the pleadings and proof is not specifically raised by the assignments of error. It is, however, embraced within the second assignment, to the effect that the evidence as a whole was insufficient for a finding by the jury of

the guilt of the defendant. Without a motion for a directed verdict, this point is not properly raised; but the proof is so manifestly insufficient that the interests of justice require us to consider the matter, notwithstanding this defect in the record. Gazzera v. United States (C. C. A.) 7 F.(2d) 467; Bilboa v. United States (C. C. A.) 287 F. 125; Wiborg v. United States, 163 U. S. 632, 16 S. Ct. 1127, 41 L. Ed. 289; Crawford v. United States, 212 U. S. 183, 193, 29 S. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392.

Judgment reversed.

DIETRICH, Circuit Judge (concurring). I would have great difficulty in agreeing to a reversal upon the sole ground assigned by the majority. While perhaps the distinction is not highly material, it is to be noted the indictment does not in terms allege that the letter mailed was in English, but only that it contained certain language which as set out is English, but which as later appeared was intended to be a translation of the Chinese. Had the objection of variance been seasonably interposed, it should have been sustained; but at no time was it intimated in the court below, nor has it been urged here. Defendant undoubtedly understood that the language as set out was intended only as a translation, for he manifested no surprise when the original was produced. The case was tried from the beginning upon the letter as written in the Chinese language, and undoubtedly the trial took the same course that it would have taken, and the evidence was the same as it would have been, had the letter been pleaded in one of the forms suggested as being proper. I am, therefore, unable to see how the defective pleading operated to deprive defendant of a fair trial, and it would hardly be contended that the record would fail to support a plea of once in jeopardy in case another indictment should be brought. As to the question whether the indictment translation is the true meaning of the instrument, that would seem to be an issue of fact, which was correctly submitted to the jury. I am unable to see how it can be held that a variance as a matter of law was thus made out.

The more serious consideration to me arises out of the attitude of the trial court, and the comments made from time to time in the presence of the jury touching the meaning of the letter. Admittedly, it is a strange document, couched in terms highly ambiguous and difficult to account for upon any theory of the writer's complete rationality. The issue should have been submitted to the jury with extreme care. But in view of what occurred, and what was said from the bench, I am unable to escape the conclusion that the jury at a very early stage of the trial was convinced that the judge strongly leaned to the construction expressed in the indictment translation. Impressions thus created cannot always be obliterated by a formal instruction advising the jurors that they are not bound by the views of the judge upon any question of fact. Here not only was no such instruction given, but the jurors were not even informed that they alone must assume the responsibility of finding upon the issue.

I think, too, it was error not to permit the witness Hammond, referred to in the majority opinion as a professional engraver, to testify. He may not have been as highly qualified as some of the government's experts—that I do not decide—but his qualifications and experience were such that he was competent, and the weight of the testimony he might have given would have been for the jury. No one of the experts was qualified in a special way, for the reason that the comparison was of a Chinese writing with other Chinese writings, and with such writings no expert had any great familiarity or experience.

For these reasons, I concur in reversing the judgment.