Argued April 8, reversed and remanded May 14, 1952

# LEATHERS et ux. *v.* PETERSON
## 244 P. 2d 619

*Wallace A. Johansen,* of Coos Bay, argued the cause for appellant. With him on the briefs were W. A.

*James A. Norman,* of Coos Bay, argued the cause and filed a brief for respondents.

Before BRAND, Chief Justice, and HAY, LUSK, LATOU-RETTE and TOOZE, Justices.

HAY, J.

This is an action in forcible entry and detainer. The complaint is in the usual form, and complies with the provisions of § 8-314, OCLA, with the additional allegation that plaintiffs are the owners in fee simple of the property involved, which is described as lots 13 and 14, block 32, Flanagan Addition to North Bend, Coos County, Oregon. The defendant, by his answer, admitted that he is in possession of the property, but denied generally the remainder of the complaint. For an affirmative defense he alleged: That plaintiff, R. H. W. Leathers, made certain money advances to defendant and to a co-partnership under the name of Peterson's Seafoods, which consisted of defendant and his wife, the latter being now deceased; that the total amount of such advances is unknown to defendant; that, to secure the same, defendant made, executed and delivered to plaintiffs certain instruments as security, but that, at the time of executing such instruments, defendant was ill and did not understand or know the full contents thereof; that plaintiff, R. H. W. Leathers, knew the physical and mental condition of defendant at that time; that said plaintiff agreed to render to defendant a statement and an accounting of the moneys advanced, and has since at numerous times promised to do so, but therein has failed; that said plaintiff has sold and disposed of property, real and

personal, without defendant's consent and without foreclosure upon his security, and has collected and received money and failed and neglected to account therefor; that defendant had no adequate remedy at law, and that the court, sitting as a court of equity, should hear and determine the respective rights and equities of the parties. He prayed that plaintiffs be required to render a full and complete accounting in the premises, and that defendant be given additional time in which to answer plaintiffs' complaint further after receiving such accounting.

Upon the filing of the answer, the justice of the peace, in whose court the action had been lodged, certified the record to the circuit court. Thereafter, plaintiffs filed a reply to defendant's affirmative answer, by which he admitted that, at one time, plaintiff R. H. W. Leathers made certain money advances to defendant and to Peterson's Seafoods, and alleged that, to secure the same, defendant made, executed and delivered certain instruments; alleged that defendant made, executed and delivered to plaintiffs a deed for the property described in the complaint, absolutely conveying same to plaintiffs, and that by virtue thereof plaintiffs are entitled to possession of such property; alleged that no accounting is due defendant "as to such property"; and denied all other material allegations of such affirmative defense.

The record indicates that the court regarded defendant's equitable defense as being well pleaded so far as it was relevant to what the court called one of the main issues in the case, that is, whether or not the deed given to plaintiffs conveying the property in dispute was intended as a mortgage. A hearing was held by the court, sitting without a jury, and was

evidently considered both by parties and court as a proceeding in equity. At the conclusion of the hearing, the judge delivered his opinion orally from the bench. He stated that the main issues in the case were, first, whether the deed was given and intended as a mortgage, and, second, whether the defendant was mentally and physically competent at the time of signing the deed, as to which issues defendant had the burden of proof. He held that the evidence was not sufficient to justify the court in saying that the deed, absolute in form, should be held to be a mortgage; that there was no sufficient proof that defendant, at the time he executed the deed, was incompetent either mentally or physically; and that defendant was not entitled to an accounting "so far as this case is concerned." The judge added that he was not deciding now what defendant might be entitled to if a suit were brought "on the general proposition" [of an accounting]. Judgment was entered for restitution of the premises, and defendant appeals.

The general rule in f. e. d. cases is that equitable defenses may not be raised, and that a defendant who depends upon equitable defenses must bring an original suit in equity, by which the f. e. d. action may be stayed and a final determination had of the respective rights of the parties in relation to the property. *Morris v. Davis*, 334 Mo 411, 66 SW2d 883, 889; *Pefkaros v. Harman*, 20 Del Ch 238, 174 A 124, 126.

In Oregon, however, the law is that, where a defendant is entitled to relief arising out of facts requiring the interposition of a court of equity and material to his defense, he may set them up by answer, without the necessity of filing a complaint on the equity side of the court; whereupon the proceedings at law are

stayed, and the cause proceeds thereafter as a suit in equity to a determination of the equitable issues thus raised. § 9-102, OCLA. It has been held, moreover, that the statute concerning the interposition of equitable defenses by answer applies to special proceedings as well as to ordinary actions. *Friedenthal v. Thompson*, 146 Or 640, 645, 31 P2d 643; *State v. Fitzgerald*, 154 Or 182, 196, 58 P2d 508. In *Crossen v. Campbell*, 102 Or 666, 677, 202 P 745, which was an f. e. d. action, plaintiff claimed the right to be restored to the possession of certain real property. Defendant denied such right, and alleged that plaintiff had forfeited whatever right he had had, and that defendant was lawfully in possession by virtue of certain facts constituting an equitable defense. The court held that the facts set forth in the answer were cognizable and the relief sought obtainable only in a court of equity; that such facts were necessary to Campbell's defense; and that, the issues thus tendered having been joined by a reply, jurisdiction of the whole controversy was thereby transferred to the equity side of the court, giving equity the authority to grant to either party the relief to which he was entitled, whether legal or equitable. See also *Friedenthal v. Thompson,* supra.

It is true that in *Crossen v. Campbell* and *Friedenthal v. Thompson,* supra, the parties stipulated to try all of the issues before the court sitting in equity, but in *Friedenthal* the court expressly held that equitable defenses were available to a defendant in special proceedings, including f. e. d., saying:

"It will be observed that when the law (§ 6-102, Oregon Code 1930), relating to equitable defenses in actions at law, was amended in 1917, no mention was made of its application to special proceedings. However, the practice has been that when an action

of forcible entry and detainer is filed in the circuit court the defendant may set up an equitable defense and this practice has received the sanction of this court: Crossen v. Campbell, 102 Or. 666 (202 P. 745); Hopka v. Forbes, 135 Or. 91 (294 P. 342).

" ' * * * When such an equitable matter is interposed, the proceedings at law shall be stayed and the case shall thereafter proceed until the determination of the issues thus raised as a suit in equity by which the proceedings at law may be perpetually enjoined or allowed to proceed in accordance with the final decree; or such equitable relief as is proper may be given to either party. * * * ' Oregon Code 1930, § 6-102."

In the case at bar, therefore, the equitable defense was properly pleaded.

Mr. Leathers and Mr. Peterson had been intimate friends for a number of years. Leathers is an accountant by profession, and for some years he prepared the income tax returns for Peterson's Seafoods. At various times, prior to March 15, 1947, he had loaned moneys to Peterson, which loans were duly repaid.

Peterson's wife died in February, 1947. In 1946, Peterson's Seafoods had done a very profitable business, but Peterson, who had acquired a habit of drinking to excess, dissipated the profits of the business by his manner of living. Leathers prepared Peterson's income tax returns for 1946, and, on March 15, 1947, Peterson gave Leathers a check of Peterson's Seafoods, drawn on the Coos Bay National Bank in favor of Leathers, for $10,000, which was intended, according to Peterson, to be applied by Leathers in payment of Peterson's federal income taxes. Besides this, Peterson gave Leathers 12 promissory notes, in sums aggregating $10,075.43, which were intended to evidence

money loaned by Leathers to Peterson's Seafoods as of that date.

As a matter of fact, Peterson's federal income tax return for 1946 showed a liability of only $3,410.25, and his state return showed liability of only $795.38, and those amounts aggregating $4,205.63 were the sums actually paid for such taxes by Leathers for Peterson. Apparently, therefore, Leathers received in cash from Peterson $10,000, and advanced him upon the 12 promissory notes $10,075.43, making a total fund of $20,075 which Leathers had available for application toward income taxes, out of which he disbursed for income taxes, as above noted, only the sum of $4,205.63. There does not appear to be any evidence that, immediately prior to March 15, 1947, Peterson was indebted to Leathers in any sum.

On September 11, 1947, Peterson borrowed $8,000 from the Coos Bay National Bank. He repaid this loan on January 12, 1948, partly through borrowing from Leathers the sum of $6,800. On this date, he gave Leathers a promissory note for $15,500, and, as security therefor, gave him a mortgage upon all of his property, real and personal, including his fish processing plant and property, his home property (which is the subject of the present action), and its furniture. There is no evidence as to the items which made up the $15,500 note. Peterson testified that he "figured" that that note included all of his indebtedness to Leathers as of that time.

After 1946, the financial condition of Peterson's business worsened. Leathers testified that Peterson had promised him that as long as he owed Leathers any money he would not mortgage any of his property; that, when Leathers found out that property had been

mortgaged to the Coos Bay National Bank in security for the $8,000 loan, he went to the bank and paid off the mortgage debt, which apparently by that time had been reduced to $6,800. This incident, according to Leathers, is what precipitated his taking the $15,500 note and mortgage.

About November 15, 1948, Peterson attempted to borrow $3,500 from the Coos Bay National Bank, but was refused. Thereupon, it was arranged that Leathers should obtain the loan, and, for this purpose, he took a deed to the home property, released that property from the lien of his over-all mortgage, and gave the bank a mortgage to secure the $3,500 loan. The $3,500 was applied on bills and current expenses of Peterson's Seafoods. Peterson testified that he had had an oral agreement or understanding with Leathers at the time when he conveyed the home property to him to the effect that, when Leathers should have received back what he had invested in the properties, with interest, the business and properties and the home property were to be reconveyed to Peterson. He testified:

> "The business was to be operated, put it this way, any time that Mr. Leathers got out what he had invested in it, with interest paid for his trouble, the business and properties and house was to revert back to me, I put it in trust, he was guardian of it, you see, he was a very good friend and he did things that nobody else would do for me, so why shouldn't I, he was in that business, loaning money. * * * "

In this, Peterson was corroborated by the testimony of Mr. Will G. Barrow, who was his bookkeeper during the period covered by these transactions. He testified:

> "Q. And at that time these papers, this understanding was made regarding this transfer, there was an understanding behind the scenes between

Mr. Leathers and Mr. Peterson and you, as to the right of Mr. Peterson to pay him back? A. I wouldn't specify the date that that was understood but I will say that there was an understanding, all of us were aware of it that, as I stated before, Mr. Peterson could repossess himself of the property and business upon the refunding of moneys due or later loaned, advanced or placed in the business.''

On November 26, 1948, Peterson conveyed and assigned to the plaintiffs, Mr. and Mrs. Leathers, all of his real and personal property, including his fish processing plant, buildings, equipment and personal property, assumed business name, bank account, accounts receivable, and fish on consignment of the approximate value of $7,600. At that time, the property which he conveyed and assigned to Mr. and Mrs. Leathers was, according to Peterson's testimony, of the following value:

| | |
|---|---|
| Home property and furniture | $12,000.00 |
| Peterson's Seafoods and real estate | 70,000.00 |
| Charleston real estate | 10,000.00 |
| Fish on consignment | 7,600.00 |
| Total | $99,600.00 |

Leathers admitted on cross-examination that there was some sort of an oral agreement between himself and Peterson with reference to a return of the property to the latter. He testified:

''Q. Was there any understanding orally made between you and Mr. Peterson that Mr. Peterson could pay you the money that you advanced, back, and that you would return his home to him? A. The only understanding, orally or otherwise that, well, at the time of deeding this property over it was understood, and thoroughly, that the property was being sold to me for what was owing to me. How-

ever, there was another understanding and one which I took up with Mr. Grant, my attorney, to the effect that I would take the business over, that I would operate it, not for any set period of time, merely operate it, and if showed any indication of being able to support itself and realize a profit, that something would be done along that line, yes.

"Q. Along what line? A. That you stated.

"Q. That you would give him the opportunity of paying you off and getting this property back? A. Yes."

On the other hand, Mr. D. J. Grant, Jr., the attorney who prepared the deed conveying Peterson's home property to Mr. and Mrs. Leathers, the mortgage securing the $15,500 note, and other instruments which were executed by Peterson about that time, testified as follows:

"Q. At that time was there any discussion as to the nature of these instruments? A. Yes, the whole matter was discussed, I would say that probably fifteen minutes to half an hour was taken up in a discussion of what the documents were, and I believe that I told Mr. Peterson there at that time not less than three times, definitely, because I wanted it clearly understood as far as he was concerned, that these were bills of sale and deeds, that when he signed them he had no right, title or interest in the property described in the instruments, and Mr. Peterson acknowledged to me that he understood that.

"Q. Did you give him any indication that there might be or that they might have a side verbal agreement? A. Mr. Leathers was sitting there, the documents weren't actually executed yet, and he made the statement to Mr. Peterson that if Mr. Leathers was able to come out on the deal, that then arrangements would be made with Mr. Peterson so that he would get the business back. I can't

tell you the exact wording but that was the substance of what was said. I advised all the parties at that time that if there was any understanding or agreement that this was not an outright sale and transfer, that if Mr. Peterson was still to retain an interest in the property, that these documents should not be signed and it would not be proper that they be signed. So Mr. Leathers and Mr. Peterson acknowledged, both acknowledged that this was an out and out transfer, and we then proceeded to execute the documents."

Mr. Grant testified further that Leathers said something about having a written memorandum to carry out an oral understanding between Mr. Leathers and Mr. Peterson with reference to the property, and that he (Mr. Grant) informed them that there was no use signing the documents if there was an oral understanding between them contradicting the effect of the documents.

We are satisfied that what Mr. Grant testified to actually took place, nevertheless, in our opinion, there was considerable evidence indicating that, despite Mr. Grant's advice, the parties still had an oral understanding or agreement contrary to the legal effect of the instruments of absolute conveyance.

Subsequent to the transfer of Peterson's Seafoods to Leathers, Peterson continued with the business in an advisory capacity, at a salary of $200 per month. From this sum, Leathers deducted $50.00 a month for rental of the Peterson home property, which Peterson continued to occupy. This arrangement continued for about five months. In May, 1949, Leathers sold the Seafoods business for $40,000. After that sale, Peterson paid no rent on the home property, and the water, light and telephone accounts, which, while Peterson was paying rent, had been charged to Leathers, were

thereafter charged to Peterson. Leathers, however, denies Peterson's testimony that he told the latter that no further rent would be payable, and says that Peterson simply quit paying. Peterson testified that, on a number of occasions subsequent to the sale of the plant by Leathers, he requested Leathers to render an accounting of his intromissions with the Peterson property, and that Leathers failed or refused to do so. In the fall of 1949, Peterson's brother, who resides in Salem, interviewed Leathers, in Peterson's behalf, and requested him to make such an accounting, and, on November 29, 1949, wrote to him as follows:

"When I visited with you in Coos Bay some weeks ago, you agreed to send to me a statement of your account with my brother Russell so that I might have it by the latter part of October. To date I have not received this statement.

"It would be appreciated if I might receive this statement from you at an early date as I expect to be in Coos Bay within the next week or ten days and should like to have it before I discuss this matter further with my brother."

In response to this letter, Leathers, under date of November 30, 1949, wrote, in part, as follows:

"Received your letter of the 29th instant and noted contents therein. Since our visit I have had a change in secretarys, and as a result have had to do most of the office work myself, and due to that fact did not get around to forwarding you a statement. What I had was only a brief and not a complete statement, being hastily prepared by my former secretary, and it was my desire to forward you as nearly as possible a complete statement.

"It now develops that the major part of the records that Berniece prepared the statement from have been returned to file and storage, and my new secretary knows nothing of the transaction and it

will be up to me personally to prepare it. Berniece is away visiting at the present time and I am preparing to leave for the annual visit with my Aunt in Berkeley and as a result it will be a few days before I can take care of the matter. You, no doubt, will recall most of the material that I presented to you on our last visit and therefore will not be entirely in the dark when talking to Russ.''

However, Leathers never did make an accounting, either thereafter or at any time. Peterson's brother testified that, about a month before the hearing in this case, that is to say, about the middle of January, 1951, he and his brother had talked with Leathers. He said:

"In the course of the conversation I asked him about the accounting and he said he didn't care to render an accounting, and later stated that if we would agree in writing to reimburse him for everything he had coming, he would render such an accounting. I told him we were entitled to an accounting without any strings attached, that my brother had no desire that he should lose any money and that we wanted an accounting free and clear of any strings of any kind.''

■■ It is hornbook law that a deed, absolute in form, may be proved by parol evidence to have been intended as a mortgage. *Young v. Evans,* 104 Or 619, 624, 208 P 741; *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* 188 Or 605, 613, 217 P2d 219. Whether or not a deed is intended as a mortgage is to be determined by the intention of the parties. *Kramer v. Wilson,* 49 Or 333, 341, 90 P 183; *Harmon v. Grants Pass Banking and Trust Co.,* 60 Or 69, 73, 118 P 188. In order to arrive at the intention of the parties, the court must take into consideration their situation, the price fixed in its relation to the actual value of the property, the conduct of the parties before and after the making of the deed,

and any other relevant surrounding facts and circumstances. *Stephens v. Allen,* 11 Or 188, 189, 3 P 168; *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* supra, p 614.

■ In this connection, a number of circumstances in evidence tend to support Peterson's contention that the deed which conveyed the Peterson home property to Mr. and Mrs. Leathers, as well as the instruments of conveyance which conveyed to Leathers the remainder of Peterson's property, were intended only for security purposes. One of those circumstances is the fact that, according to Leathers' own testimony, as of November 19, 1948, Peterson's indebtedness to him was "any amount between ten and twenty-four thousand dollars."

Even taking the larger figure as representing the indebtedness at that time—as to which the evidence, to say the least, is quite inconclusive—it is to be remembered that, shortly thereafter, Leathers sold the Peterson's Seafoods property for $40,000, or far more than sufficient to repay the debt, leaving in his hands property valued by Peterson at $29,600. The facts that Peterson, after what is claimed to have been an absolute sale of his property, continued, in effect, as manager of the plant, at a nominal salary, and was consulted by Leathers during the negotiations for sale of the plant, which was a matter of some weeks, are circumstances indicating that Peterson still had at least some interest in the property, and surely called for an explanation. Moreover, Leathers was an experienced and successful business man, an income tax counselor and public accountant, one accustomed, no doubt, to making and dealing with business records. It is almost incredible that such a man should be unable to produce evidence of the state of his account with Peterson. The

fact that Leathers was dealing with a person whose drinking and spending habits were playing ducks and drakes with his fortune and with his business, and was taking from him conveyances and assignments of property which, as far as this record indicates, was of much greater value than any indebtedness which was owed to him, made it almost mandatory that Leathers should at all times have been prepared to account. Indeed, we are at a loss to comprehend why he does not gladly seize the opportunity of being permitted to account in a public hearing.

██ Peterson's drinking habits and extravagance had apparently affected his credit adversely with the local banks, so that, although he had considerable property, he was unable to borrow any money and therefore became financially embarrassed. This is a further circumstance that the court must take into consideration in considering whether or not the various conveyances were intended for security purposes rather than as absolute conveyances. *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* supra, 188 Or 605, 633, 217 P2d 219. Another such circumstance is the fact that Leathers and Peterson had been intimately associated, both in a business way and socially, for years before the transactions under consideration here. This circumstance might tend to indicate that they dealt as close friends and not at arm's length, that Peterson, as he testified, trusted Leathers completely, and that these facts, coupled with nervous tension induced in Peterson by his bad habits and financial difficulties, created a relationship between them which could only be described as fiduciary.

It is argued in Leathers' behalf that it is wholly improbable that a creditor, who already had a mortgage

to secure his claim, should take another mortgage for the same debt in the form of an absolute conveyance of the same property, without any apparent advantage to him, citing *Colahan v. Smyth,* 159 Or 569, 574, 81 P2d 112. But the improbability becomes less evident when one considers the fact that the deed to the Peterson home property (which is what counsel were talking about in this connection) was given to enable Leathers to borrow $3,500 for Peterson from the bank, which $3,500 was immediately used to defray certain pressing obligations and current expenses of Peterson's Seafoods, a business which Leathers acquired, by what he claimed were absolute conveyances, within a few days after he secured title to the home property. Moreover, looking at the conveyance of the home property as a transaction by itself—which is what Leathers seeks to have us do—the transaction would be a conveyance of a property worth $12,000 for a consideration of only $3,500.

█ It is contended that, in order for a grantor to have an instrument, which is, on its face, an absolute conveyance, declared to be in equity a mortgage, it is necessary that he establish by clear and convincing evidence, that it was intended by the parties to be such, and that, in this connection, the law imposes upon him a heavy burden of proof. That may be conceded, but, under the circumstances of the present case, the proof, if any there be, lies in the breast of Mr. Leathers or upon his business records, and it is apparent that Peterson will be unable to furnish it unless Leathers is obliged to render an accounting. Whether or not the evidence which will be disclosed by such accounting will furnish the clear and convincing proof which the law requires, is something that can be determined only after the accounting has been made.

It is asserted that the test to determine whether a deed absolute on its face is in effect a mortgage is: Was there a debt created, or was there a pre-existing debt continued for which the instrument was designed as security? If there is no debt, there can be no mortgage. *Caro v. Wollenberg,* 68 Or 420, 427, 136 P 866; *Bickel v. Wessinger,* 58 Or 98, 106, 113 P 34; *Niehaus v. Shetter,* 78 Or 447, 452, 153 P 486. But, again, these are questions which can be resolved only after an accounting.

While defendant's affirmative answer does not go so far as to claim that he was mentally or physically incompetent at the time of the execution of the various instruments, it does allege that he was ill, that he did not understand the full contents of the papers which he signed, and that Leathers knew of his physical and mental condition. These allegations fell short of saying that defendant was incompetent, and, in any event, the experienced trial judge held that there was no sufficient evidence that defendant was incompetent. The judge said that it would be preposterous for the court even to think of setting aside the deed to the home property and holding it as a mortgage on the basis of the testimony which had been introduced. We are inclined to agree, but our feeling is that if Leathers had been required to make an accounting, the state of the evidence might have been very much different. We think that he should have been required to account, and we think that the trial judge was of the same opinion. He took the view, however, that an accounting could be required only in a separate suit. He said: "What he [Peterson] might be entitled to if a suit were brought on the general proposition I am not deciding now but in this case I do not think he is entitled to an accounting at all, * * * "

We have said that, contrary to the general rule, a defendant in an f. e. d. action in Oregon may set up equitable defenses. The trial judge apparently felt that while defendant herein could set up such defenses so far as they might tend to disprove plaintiff's right to possession of the premises in dispute, yet he would not be permitted to go further and litigate such equitable defenses to the extent that a decree upon the issues raised thereby would be res judicata. Therein, we think the trial court erred. Defendant having put forward equitable defenses, the cause should have proceeded thereafter as a suit in equity. In order to avoid a multiplicity of suits, the controversy should be fully determined by a final decree adjusting the rights and equities of the parties. The court of equity, having assumed jurisdiction of the cause upon equitable grounds, should consider and determine the entire subject matter. *Crossen v. Campbell,* supra, 102 Or 666, 677, 679, 202 P 745; *American Surety Co. v. Hattrem,* 138 Or 358, 364, 3 P2d 1109, 6 P2d 1087; *Public Market Co. v. Portland,* 171 Or 522, 595, 130 P2d 624, 138 P2d 916; § 9-102, OCLA.

The cause will be remanded for the purpose of requiring Mr. Leathers to make an accounting of all of his transactions in relation to Mr. Peterson's property and funds. Upon such accounting having been made, the court will permit Mr. Peterson to file an amended answer, if he be so advised, and, upon the issues thereunder being made up, will proceed to hear and determine such issues, both equitable and legal.

The judgment appealed from is reversed, and the cause remanded for further proceedings not inconsistent herewith. Costs will be awarded to appellant.