**R. H. W. LEATHERS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15428.**

United States Court of Appeals
Ninth Circuit.

Nov. 22, 1957.

Raymond M. Kell, Clifford B. Alterman, Portland, Or., for appellant.

C. E. Luckey, U. S. Atty., Portland, Or., for appellee.

Before HEALY, POPE and CHAMBERS, Circuit Judges.

POPE, Circuit Judge.

Leathers was convicted upon a charge of violating § 145(b) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 145(b), by knowingly filing a false return for one Russell A. Peterson for the year 1946. Leathers was an accountant and his client, Peterson, was the proprietor of a fish and crab processing plant near North Bend, Oregon, operated under the name of "Peterson's Sea Foods". They had been acquaintances and friends for a number of years and Leathers had on several earlier occasions made out Peterson's income tax returns.

In the Spring of 1947, Leathers at Peterson's request, made out the tax return here in question and Leathers attended to the filing of the return. He also paid the tax shown thereon from funds which he had received from Peterson in the manner hereafter described.

Upon the return Leathers signed his own name as the person who prepared the return and he also signed Peterson's name on the line provided for the signature of the taxpayer. The return showed net income of $15,910.05, and a total tax of $4010.25. The indictment charges that this was a false and fraudulent income tax return in that Peterson's net income for the year 1946 was $56,910.05 upon which Peterson owed the United States a tax of $28,977.41, all as the defendant Leathers then and there very well knew.

The evidence showed that the return was false and understated Peterson's income to the extent alleged in the indictment. The respect in which it was false was that in the year in question Peterson's total receipts from sales of merchandise were $277,555.64, while the return understated these receipts by exactly $41,000, and showed total receipts of only $236,555.64.

Peterson's bookkeeper, Barrow, who had acted in that capacity for several years, testified that at the end of 1946, he made a recapitulation of the figures making up the receipts and expenses in a form sufficient to supply the necessary information for the making of a tax return. This recap, he testified, was prepared for the expected use of the accountant and a carbon copy was retained in the office. The carbon copy was introduced as a Government exhibit. It disclosed the gross sales figure mentioned above, and listed in detail the business expenses including wages, taxes, insurance, rent, etc. Its substantial accuracy as a transcript of what was shown on the books is not questioned as the books also were produced at the trial and the Government witnesses verified the accuracy of the recapitulation.

The Government's evidence designed to disclose a wilful falsification of this tax return by Leathers tended to show that he, Leathers, undertook to make this false return as a part of an elaborate scheme to defraud Peterson. Leathers had the complete confidence of Peterson, who was an unlettered man and unfamiliar with the figures of his own books. He told Peterson that his computation of the income and deductions showed that Peterson's income tax for the year 1946 came to "a little over $16,000 Federal and around $4,000 State." Peterson stated that he was short of funds to provide payment of a tax of that amount and Leathers offered to loan him a portion of the required amount. Accordingly Peterson gave Leathers his check for $10,000 and signed notes to Leathers for approximately $10,000 more. However, the federal return made up by Leathers, and not shown to Peterson, stated a total income of $16,410.05, and a total tax of $4,010.25, upon which $600 had been previously paid on declaration of estimated tax. What Leathers then paid on filing this return was only the balance, or $3,410.25.

These deceptions thus resulted in Leathers being able to pocket the difference between the amount paid by him on the taxes (which included something under $1000 paid on State taxes) and the $10,000. In addition to that, Leathers had the notes which Peterson gave him for the supposed loan, and it appears from the testimony elicited on cross-examination of Peterson that because he held these notes, Leathers soon wound up in possession of deeds both to Peterson's business and to his home as well. Peterson had to recover his property through litigation in the Oregon courts.[1] It was not until some time in 1948, when Government agents began interviewing him about the tax return, that Peterson discovered that the $16,410.25 was entered on the return as the net earnings and not as the tax, and that the signature was not his own.

■ Appellant asserts that his conviction cannot be sustained because of a lack of proof that he wilfully evaded Peterson's taxes. The argument in support of this contention is based upon an assertion that there was no proof that when Leathers made out the Peterson tax return he had possession of the recapitula-

1. See Leathers v. Peterson, 195 Or. 62, 244 P.2d 619.

tion of the book accounts for 1946 which the bookkeeper had prepared, or that he had made up the figures in the return from the books themselves.

Barrow, the bookkeeper, testified that he did not personally deliver the recapitulation sheet (Government Exhibit 17 at the trial) to Leathers, although he had prepared it for the use of whoever made up the tax return. Peterson's testimony was that he did not give Leathers information relating to his tax return but that he told Leathers he could procure the necessary information from Mr. Barrow. The argument on behalf of appellant amounts to saying that Leathers could not be charged with knowingly or intentionally understating Peterson's income in the return because it was not specifically proven that the recapitulation sheet was ever given or shown to Leathers.

We are of the opinion that the evidence of a wilful and intentional evasion of a tax was sufficient. In the first place, there is substantial evidence from which the jury could properly infer that Leathers did in fact have the recapitulation sheet, Exhibit 17, when he made up the return. The witness Amos, an intelligence agent in the internal revenue service, testified that when he went to interview Leathers at the office of the latter's attorney, Leathers told him that Peterson had given him some sheets containing data from which to prepare the return, and that he had copied the data on a work sheet. He showed the work sheet to the witness.

An examination of the items of deductions listed by Leathers on the return, show that some 16 of them corresponded precisely with similar items on Exhibit 17, the recapitulation sheet made by Barrow. The jury was warranted in finding that although Peterson testified that he did not hand the recapitulation sheet prepared by the bookkeeper to Leathers, yet Leathers must have come in possession of it before he made the return. If we were to accept appellant's version of the record we would have to assume that the evidence tended to show no more than that Leathers pulled the figures for the return out of the air or drew upon his own imagination. The jury were not required to view the evidence in that light. As previously indicated, the return understated the gross receipts by exactly $41,000 showing $236,555.64, instead of the true amount of $277,555.64. It would tax one's credulity to assert that the figure in the return was arrived at simply by chance.

Other evidence strongly points to the guilty intent. At the time in question Peterson had been drinking heavily and was in no condition to look after his own affairs. Leathers had Peterson's full confidence and in consequence there was an easy opportunity for him to take advantage of that confidence to defraud Peterson through the use of a scheme to understate the income and the tax due and to over-collect from Peterson for the taxes. The circumstances all indicate that he took advantage of this opportunity in carrying out his motive for gain by defrauding both Peterson and the Government. Also significant is the fact that after the Government began investigating the 1946 tax return, Leathers went to Peterson and talked to him at length about the income tax and tried to persuade Peterson to destroy his records.[2] This is strong evidence of guilt. "It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." Wigmore on Evidence, 3d Ed., § 276.

Appellant further argues that Peterson's books were improperly received in evidence and should not have been

2. "He said, 'Russ,' he said, 'I can turn that property back to you like your home on that Charleston property; but if I do, you owe the Federal money, so much in taxation they will only come in and take it away from you anyway. It will go a lot better if you got any of those record,' he said, 'throw them in the crapper. I haven't got the cash now, but,' he said, 'I will take care of it eventually.' "

used against him. There is no substance in this contention. Obviously the books were appropriate for the purpose of showing the true amount of the 1946 income. We have heretofore noted that Leathers was connected with the books because of the circumstance that he must have had access to the recapitulation of the books made by Barrow.

■ Appellant also says that the court erred in unduly restricting him in cross-examination of the witness Peterson when he was attempting to show bias, prejudice and interest of such witness, and the latter's prior inconsistent conduct. During this cross-examination of Peterson, it was developed that the witness and Leathers had a civil lawsuit which had gone to the Supreme Court in Oregon (see footnote 1, supra), and that following the decision of the Oregon Supreme Court, the litigation was settled by an agreement under which Peterson's business and home were returned to Peterson. It was further developed that the effect of the Oregon court's judgment was that Leathers must account to Peterson. It was also brought out that as a part of the settlement between the two, Peterson paid Leathers approximately $3000 in cash. The defense then sought to procure from Peterson an admission that in the course of settlement or negotiation for a settlement Peterson made no demand on Leathers for the approximately $16,000 excess amount, in cash and notes, that Leathers was charged with obtaining from Peterson for the supposed purpose of paying taxes. To this Peterson replied: "He took it from the Federal Government; he didn't take it from me." Defense counsel then asked "Isn't it also true, Mr. Peterson, that in the course of that settlement and as a part of the settlement you did not make any demand and did not require Mr. Leathers to make good any sum to the Federal Government?" This question was objected to on the ground that it would be impossible for Peterson to require Leathers to pay a sum to the Federal Government. The objection was sustained.

We note that during this cross-examination the defense was permitted to show (a) that Peterson had had a lawsuit with Leathers; (b) that the litigation was terminated by a settlement; and (c) that in the settlement, Peterson got back his business and home, and paid Leathers $3000 in cash. Of course the object of this examination was to show bias and hostility on the part of Peterson toward Leathers and to show that the settlement was inconsistent with the present claim of Peterson that Leathers had wrongfully procured some $16,000 from him for taxes which Leathers did not pay. It is difficult to perceive what prejudice the defendant suffered by being prevented from pursuing the inquiry as to whether Peterson required Leathers to make good any sum to the Federal Government.

■ Appellant further objects that his cross-examination of the witness Peterson was improperly curtailed when the court sustained objections to questions as to whether the Government had indicated to Peterson that he would not be liable for the unpaid taxes for 1946 or as to whether the Government had ever made any demand upon him for payment of those taxes. The appellant's argument is that he had the right to make extended inquiry along this line for the purpose of developing that Peterson had some understanding, or at least a hope, that he would be excused from paying those taxes, and that this would tend to give Peterson a motive to give testimony favorable to the Government.

The record shows that defendant was permitted to elicit from Peterson on cross-examination what in substance amounted to evidence that no demand had been made upon him for the payment of taxes. The question and answer were as follows: "Well, then, let me ask you, what has the Federal Government and the officials told you concerning your liability for these taxes? A. They

haven't told me anything as yet."[3] The particular point here made relates to the court's ruling sustaining an objection to the question next following which was "Have they ever indicated to you that you would not be liable for the taxes?" At the time the ruling was made, defense counsel stated the basis for his inquiry, and the following ensued:

"Mr. Darling: The basis of that inquiry, it is our understanding that we are at all times entitled to inquire of any witness concerning any interest, any promise of immunity, anything else that he may have obtained from the prosecution in a case like this.

"The Court: He said the Government has said nothing to him about it.

"Mr. Darling: Well, I was merely addressing a further question on that same line.

"Mr. Luckey: If he wants to ask him if he has been promised any immunity or anything, that would be fine.

"The Court: It is entirely different from whether or not the Government is pressing any claim against him, I will abide with my ruling."

Later on in the course of the cross-examination, counsel for the defense again asked: "Well, now, since that time has the Government ever made any demand upon you for the payment?" The same objection was again sustained.

It seems clear that in making these rulings the court considered that it was cutting off repetition of an inquiry that the witness had previously answered when he said: "They have not told me anything as yet." It is also apparent that counsel for the Government indicated that no objection would be made to inquiries as to whether Peterson had been "promised any immunity or anything". It would seem that Government counsel was thereby indicating that there would be no objection to an inquiry as to whether the Government had promised either immunity or a release. Defendant was thus able to bring out that Peterson had not been called upon to pay the balance of the taxes and to argue to the jury that Peterson gave his testimony in the hope that he would not be asked to pay the taxes. For reasons satisfactory to the defense counsel he refrained from an inquiry as to whether the Government had promised any release or immunity. In these rulings the trial court did not abuse its discretion.

■■ In respect to the conduct and extent of cross-examination, it has long been the rule that these are matters spe-

---

3. Defense counsel led up to this inquiry following his prior inquiry, mentioned above, relating to the terms of the civil litigation. The examination proceeded as follows:

"Q. (By Mr. Darling): Mr. Peterson, isn't it true that you have taken the position and do now take the position that when you gave the ten thousand dollar check to Mr. Peterson—I mean Mr. Leathers, that when you gave the ten thousand dollar check to Mr. Leathers in March of 1947 or sometime in 1947 and when you gave him notes in the amount of some ten thousand dollars that you gave him that money and notes on the representation made by Mr. Leathers that he was going to use that money in the payment of Federal taxes and State taxes? A. Yeah; the combination of State and Federal tax.

"Q. Well, then, isn't it true that your position as of this time is that when that happened that he only paid some four thousand dollars on taxes and pocketed the some sixteen thousand dollars? A. That's what it looks to me like.

"Q. That is the position that you took in the trial of the case between you and Mr. Leathers in the Circuit Court of the State of Oregon, is it not? A. But, really, that money didn't belong to me; it belonged to the Federal Government. It is money that I gave them.

"Q. That is the position that you took, was it not, that—all during that time? A. Well, now, if he didn't pay the one thing, I don't know as the Federal Government is going to come back after me for collection. If they do, then I owe it.

"Q. Well, then, let me ask you, what has the Federal Government and the officials told you concerning your liability for these taxes? A. They haven't told me anything as yet."

cially subject to the discretionary control of the trial judge. McCormick on Evidence, § 24, p. 47; Wigmore on Evidence, 3d Ed., § 944. Plough v. Baltimore & O. R. Co., 2 Cir., 164 F.2d 254, 255.[4] The reason for this traditional deference to the discretion of the trial judge in putting a limit to cross-examination is illustrated by what happened here in respect to the attempted continuation of inquiries as to what demands Peterson made on Leathers in connection with the settlement of the civil litigation. Defense counsel were able to elicit that instead of collecting cash from Leathers, Peterson paid Leathers some $3000. It was within the discretion of the trial court to rule that further inquiry was improper for it is plain that if inquiry were extended indefinitely into the terms of that settlement, the court might well find itself trying the collateral issue as to the reasonableness of the settlement. Thus in Meeks v. United States, 9 Cir., 179 F.2d 319, 321, this court held that a defendant might properly elicit testimony on cross-examination of a government witness that the witness and defendant had engaged in a battle in which the witness had been beaten by the defendant. But we ruled that defendant was properly prevented from inquiring into the circumstances of the alleged assault saying, "It is apparent that had appellant been permitted to make the offered proof the court and jury would have been called upon to try a collateral issue. The ill will and unfriendly feeling of the witness was shown. The details were properly excluded." In so ruling this court followed Lau Fook Kau v. United States, 9 Cir., 34 F.2d 86, 91, where we said in respect to similar rulings: "Both these matters are so largely in the discretion of the trial judge that they can only be reviewed where there has been a manifest abuse of discretion." We hold that there was no abuse of discretion here. It is indeed difficult to perceive how the defendant

could have been prejudiced by these rulings.

Finally appellant assigns error on account of the court's refusal of his motion for a mistrial based upon an alleged improper closing argument made by the United States Attorney to the jury. The portions of the argument to which appellant objects were remarks designed to answer arguments which had been made to the jury by counsel for the defense. The United States Attorney referred to the defense counsel's argument as to the inferences to be drawn from the terms of the settlement of the civil litigation between Peterson and Leathers. In referring to this Government counsel said: "Where is the settlement, if the settlement is so important that the defendant entered into with Mr. Peterson?" Again referring to an argument that had been made that Leathers must have worked from a work sheet other than Exhibit 17 when he made the tax return, counsel said: "Where is such a work sheet? Where is whatever it was that Mr. Leathers showed to Mr. Amos at the office of Vonderheit? If there is another one, where is it, ladies and gentlemen?"

It is the argument of the appellant that only the defendant himself could have testified about the settlement or about the other work sheet and hence that the United States Attorney in commenting upon the defendant's not producing these documents was in effect and substance demanding to know why the defendant did not take the stand and testify. This, it is said, deprived the defendant of due process and of his privilege against self-incrimination and impinged upon his right not to testify.

The premise upon which this argument is based cannot be supported. The record shows that in making the settlement referred to, Peterson and Leathers were both represented by counsel and of course Leathers' counsel might have produced the settlement agreement or

4. "Federal courts have adopted a liberal attitude toward the admission of evidence, otherwise irrelevant and prejudicial, to show bias on the part of a witness. * * The matter rests largely within the sound discretion of the trial judge."

testified with respect to it. As for the work sheet in question, Amos, the Government agent, testified that the work sheet which Leathers told him he had procured from Peterson was shown to Amos and another agent on an occasion when they visited Leathers and his attorney, Mr. Vonderheit, at the latter's office. At that time Amos testified he and the other agent were permitted to examine the work sheet for a brief period. This is the substance of the testimony relating to the work sheet. Certainly there is no basis for saying that Leathers was the only person who could testify with respect to that work sheet for both Leathers and his attorney were present on that occasion. Whatever was said and done then was plainly intended for the ears and understanding of the two Government agents. There was no element of a confidential communication then taking place between Leathers and his attorney, and the knowledge obtained by the attorney on that occasion was in no sense confidential, and his testimony would not be subject to any privilege.[5] Cf. Himmelfarb v. United States, 9 Cir., 175 F.2d 924, 929; McCormick on Evidence, § 95, pp. 190 to 191.

■■■■ Since it is apparent that Leathers was not the only person who knew about these matters or could testify to them, the remarks of the United States Attorney did not amount to a comment upon the failure of Leathers to take the stand. As we said in Langford v. United States, 9 Cir., 178 F.2d 48, 55, aside from those special cases where it appears that the accused himself is the only one who could possibly contradict the Government's testimony, the prosecutor may properly call attention to the fact that the testimony of the Government witnesses has not been contradicted. In like manner we think it was not improper here to comment on the failure of defense to produce the settlement or the work sheet.

The judgment is affirmed.

5. "One of the circumstances, by which it is commonly apparent that the communication is not confidential, is the presence of a third person, not being the agent of either client or attorney. Here, even if we might predicate a desire for confidence by the client, the policy of the privilege would still not protect him, because it goes no further than is necessary to secure the client's subjective freedom of consultation * * * and the presence of a third person (other than the agent of either) is obviously unnecessary for communications to the attorney as such, —however useful it may be for communications in negotiation with the third person." Wigmore on Evidence, 3d Ed., Vol. 8, p. 602, § 2311.