Argued June 9, affirmed December 14, 1960, petition for
rehearing denied January 17, 1961

# BLUE RIVER SAWMILLS, LTD., ET AL *v.* GATES ET AL

358 P. 2d 239

442

*Mark V. Weatherford,* Albany, argued the cause for appellants. With him on the brief was Sidney E. Ainsworth, Ashland.

*Karl T. Huston,* Corvallis, argued the cause for respondents Gates. On the brief were Huston, Thomas & Johnson, Corvallis.

Before McAllister, Chief Justice, and Rossman, Warner, Goodwin and Holman, Justices.

WARNER, J.

This is a suit in equity, wherein plaintiff Blue River Sawmills, Ltd., a corporation, organized under the laws of the Province of British Columbia, Canada (hereinafter called Blue River), and plaintiffs Shroyer, husband and wife, seek to have a conveyance, absolute on its face, declared to be a mortgage and for further and related relief premised upon plaintiffs' theory that the consideration for a certain transaction had in January, 1956, was in fact a loan and not a sale, as contended by the Gates. From an adverse decree, plaintiffs appeal.

The subject matter of the deed was the conveyance of 29 perpetual timber licenses issued by the Canadian government. They were in the nature of grants of rights to cut timber on 29 sections of government lands situated in British Columbia, Canada. We shall hereinafter refer to the deed as a conveyance of "timber."

For convenience we shall refer to the plaintiff Shroyer and the defendant Gates as if they were the only plaintiff and defendant having those names, although, in fact, their respective wives were joined as plaintiffs or defendants.

The plaintiffs advance but one assignment of

error, which in substance is: that the trial court erred in decreeing the transaction of the parties to be one of absolute sale instead of a mortgage loan.

The negotiations had between Gates and Shroyer and Blue River were consummated on the sixth of January, 1956, and finally reflected by the execution of the following documents, subsequently prepared by the solicitor for Blue River: (1) a deed (Exhibit P), absolute on its face, executed by the plaintiff Blue River, in Vancouver, B.C., as of January 13, 1956, to the defendant Gates and wife, conveying the timber to which we have already made reference. This was acknowledged on behalf of the grantor corporation on January 20, 1956, by F. J. G. Johnson, its secretary and one of its directors, pursuant to a resolution of all of its stockholders, dated January 13, 1956. The consideration for the deed was $150,000 paid to Blue River by Gates on or about January 30, 1956;[1] and (2) an option agreement (Exhibit A), dated as of January 13, 1956, and executed in Benton County, Oregon, by the Gates, as vendors, who, in consideration of $1,000 from Blue River, therein called the purchaser, granted to Blue River a right to repurchase the timber conveyed by the deed upon payment of certain sums at the times therein stipulated.

An escrow agreement (Exhibit D) was thereafter entered into by and between the parties to the option with defendant United States National Bank, as escrow agent, at its Corvallis Branch, on March 13, 1956. Deposited with the bank for its guidance was a copy of the option, the 29 timber licenses described

---

[1] It may be well to here note that the deed did not include the Blue River sawmill in which that corporation had a very substantial investment. The mill was situated on different land covered by other timber licenses. After the sale of two timber licenses to Diamond Mills, Ltd., in January, 1956, it still retained 19 of the original 50 which it had earlier acquired from Messrs. Holmes and Brockmier.

in the deed from Blue River to Gates, and a deed from the Gates to Blue River (Exhibit B), for delivery to the latter upon payment of the sums required by the option on or before the dates therein stipulated. Although the option agreement was executed by the Gates in January, as above indicated, the $1,000 consideration therefor was not withheld from the amount paid by Gates for the deed received from Blue River. Meantime; that is, between January thirteenth and a date early in March, 1956, the option reposed in the office of Gates' Canadian solicitor, George William Lane, who then delivered a copy thereof to Blue River upon receipt of $1,000 in behalf of Gates. This delay in payment of the consideration for the option accounts for the delay in completing the escrow arrangement to which we have made reference above.

The pertinent part of the option to repurchase given by Gates to Blue River relates to the amount of payments necessary to repurchase the timber if made on or before the three alternative payment dates therein specified. That part of the instrument reads:

"FIRSTLY the sum of Two hundred and twenty five thousand ($225,000.00) Dollars if such sum is paid to the United States National Bank at Corvallis in the State of Oregon, United States of America (hereinafter called 'the Bank') between the 31st day of July 1956 and the 15th day of October 1956.

"SECONDLY in the alternative the purchase price shall be the sum of Three hundred thousand ($300,000.00) Dollars if such sum is paid to the Bank between the 15th day of October 1956 and the expiration of two (2) years from the date of this Agreement.

"THIRDLY in the further alternative the purchase price shall be the sum of Three hundred thousand ($300,000.00) and interest payable as follows; that is to say, the sum of One hundred and seventy five thousand ($175,000.00) Dollars if such sum is paid to the Bank between the said 31st day of July 1956 and the expiration of two (2) years from the date of this Agreement and the further sum of One hundred and twenty five thousand ($125,000.00) Dollars if such sum is paid to the Bank together with interest as hereinafter mentioned within three (3) years from the date of this Agreement. The said interest shall be at the rate of ten (10%) per cent per annum upon the said sum of One hundred and twenty five thousand ($125,000.00) Dollars and shall be calculated as from the date of payment of the said sum of One hundred and seventy five thousand ($175,-000.00) Dollars up to the date when the said sum of One hundred and twenty five thousand ($125,-000.00) Dollars shall be paid to the Bank."

The documents, except the escrow agreement, to which we have made reference were prepared in the offices of Hamilton Read, of Vancouver, B.C., solicitor for Blue River.

There is but little diversity of opinion of counsel regarding the law of the case.

■ The primary inquiry in a matter of this kind relates to the discovery, when possible, of the mutual intention of the parties *at the time the transaction was consummated*. It is then the character of their dealing is fixed. *Umpqua Forest Ind. v. Neenah-Ore. Land Co.*, 188 Or 605, 628, 217 P2d 219 (1950); *Harmon v. Grants Pass Banking & Trust Co.*, 60 Or 69, 73, 118 P 188 (1911); 1 Jones, Mortgages (8th ed), 380 § 314.

This intent must be sought in all the circumstances surrounding the transaction, the pecuniary relations

of the parties, their previous negotiations and their acts contemporaneously with the making of the deed, as well as by the written memorials of the deal.

The subsequent acts and admissions of the parties respecting the subject matter of the contract, while material and relevant, are to be considered rather as evidence or corroborative of a previously-existing intent shown to exist. *Elliott v. Bozorth,* 52 Or 391, 396, 97 P 632 (1908); *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* supra, at 614; *Leathers v. Peterson,* 195 Or 62, 75-6, 244 P2d 619 (1952); *Beall v. Beall,* 67 Or 33, 128 P 835, 135 P 185 (1913); 1 Jones, supra, 369 § 309. But such subsequent declarations or admissions should be closely scrutinized and weighed with caution on account of the possibility of witnesses misapprehending the language used and the difficulty of repeating its import. *Stephens v. Allen,* 11 Or 188, 196, 3 P 168 (1884).

■ As a further preliminary to our evaluation of the facts, we take note of certain controlling propositions of law in a matter of this kind. Based on the maxim that a person takes ordinary care of his own concerns (ORS 41.360(4)), a disputable presumption arises from the execution of an absolute deed that such an instrument evidences the intention of the parties, except in cases of fraud. *Harmon v. Grants Pass Banking & Trust Co.,* supra (60 Or 69); *Smith v. Headlee,* 93 Or 257, 264, 183 P 20 (1919).

■ Proceeding from the premise that a deed, absolute on its face, is what it purports to be, there is a heavy burden cast upon the proponent of a construction to the contrary. It calls for proof that is clear, convincing and consistent if such a proponent would succeed. In the absence of such evidence the presumption that the conveyance is what it purports to be

must prevail. *Smith v. Headlee,* supra (93 Or at 264); *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* supra (188 Or at 645); *Cole v. Fogel,* 210 Or 257, 261, 310 P2d 315 (1957); *Sweek v. Bennett,* 133 Or 388, 396, 290 P 747 (1930); *Emrich v. Emery,* 216 Or 88, 93, 332 P2d 1045, 335 P2d 604, 337 P2d 972 (1958); Osborne, Mortgages, 182 § 74; 5 Tiffany, The Law of Real Property (3d ed), 259 § 1395.

■ The negotiations had between the parties prior to the consummation of the transaction usually offer the most promising point of inquiry. In the instant matter it produces the contradictions in evidence concerning what the respective parties said and did in the offices of appellants' counsel, Read, of Vancouver, B.C., immediately before he drafted the deed and option agreement.

■ But we do not begin with those conferences in our examination of the record. We turn back to the point of Gates' first contact with Shroyer. In so doing we have in mind the rule to the effect that the business, social or other relationships of the parties are circumstances relevant to the main issue of intentions. *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* supra (188 Or at 633); *Corey v. Roberts,* 82 Utah 445, 25 P2d 940. Thus, we discover several significant uncontroverted facts that bear heavily upon our ultimate conclusion.

Both Gates and Shroyer were at all times hereinafter mentioned and for sometime prior thereto residents of Benton County, Oregon. Both had long been in the logging, sawmill and timber business in that area and had prospered to a substantial extent. There is nothing in the record to suggest that Gates was or ever had been in the business of loaning. Neither had, however, met before 1955 and that meeting took

place in British Columbia, although they seemed to have heard of each other before that time.

Gates stated that his reason for being there at that time arose out of his concern for the future of his Benton county mill; that he only had about three years' supply of timber left for its operation so had gone to Canada several times (previous to meeting Shroyer) "looking for a good size block of timber somewhere to put a mill into."

It is from Shroyer that we take our knowledge of their first meeting. It was sometime, he said, in September, 1955, although Gates recalls it as being in August, Gates stopped and remained overnight at the Blue River mill. Shroyer says he told him "he was interested in looking around for some timber" and was enroute to inspect a holding north of the Blue River property. Gates, after two or three days, again stopped at the Blue River mill "on his way back * * * to the States." As he left "he said if I [Shroyer] heard of anything good or anything, why to let him know; that he wasn't able to find anything down here [in the United States], that things were pretty tight." There is no record of any discussion at the time concerning any species of a money deal between Gates and Blue River or Shroyer.

A second and casual meeting was had between Shroyer and Gates on the streets of Shroyer's hometown, Philomath, Oregon, sometime in December, 1955, about a week or two before Gates received Shroyer's telegram, to which we will soon refer. Gates' account of this meeting is as follows:

"A Yes, I met him on the street one day in Philomath and he says, 'Did you ever find any timber up in Canada?' I says, 'Yes, I found timber up there but I never did buy any.'

"Q Did he at that time make any indication that he might be willing to sell you some?

"A Yes. He says, 'We might sell you some timber up there.' He says, 'We would like in case you'd like to get going up there and at that time like to have the chance to buy it within two years,' and we walked on and that was all that was said. I didn't think any more about it at the time."

Shroyer established the time of the second meeting as "sometime during the Christmas holidays, after Christmas * * *." His testimony concerning that conversation reads:

"Q Do you remember what was said there?

"A No, only that we were still in need of money and I didn't know what to do and he didn't know what he could do, and finally after talking to his attorneys why he thought that he could loan us some money if he could get enough security but he had to be assured that he had enough security so he wouldn't lose anything."

Because of the telegram which Gates received from Shroyer on December 19, 1955, we are disposed to resolve the conflict concerning conversations which they had in Philomath in favor of Gates' version.

Shroyer testified that he did not see Gates again until "sometime in the middle of December or maybe a little later"; that this third meeting between the two men was at Blue River, adding: "I don't know why he come up." This last remark is difficult to harmonize with the telegram which Shroyer sent to Gates from Blue River under date of December 19, 1955, which defendants shortly after Shroyer's remark introduced as Exhibit 4. It read as follows:

"1955 Dec 19 AM 8 29
"Blue River BC 18 450P

"Bob Gates

"Fone Plaza 36832 Corvallis Ore

"Twenty million feet of timber available for you accessible by jeep. Logging to stop on road Thursday. Try to come immediately. Reply requested.

"Geo Shroyer"

Gates, in response to the telegram, arrived at the Blue River mill a day or so before or after Christmas in 1955. This marked Gates' third meeting with Shroyer, but Gates' first trip to Canada since September, 1955.

In the meantime; that is, between Gates' visit to Canada in August or September and his next contact with Shroyer there in December, Shroyer tells us the following had transpired: "* * * the money situation [for Blue River] had got worse. We had thought that maybe *we could sell him some timber,* twenty million feet, I believe it started at, at $5, * * *." (Emphasis supplied.) "We," as used by the witness at this juncture, we read as Shroyer's associates in the Blue River operation. We note, too, that in considering a sale of a part of Blue River's holdings, it then contemplated raising only $100,000.

Thus, we find from Shroyer's testimony that from September to at least the time of Gates' return to British Columbia, Gates was known to Shroyer only as a prospective buyer, and by reason of Shroyer's telegram of December nineteenth, Shroyer was known to Gates only as the locator of a prospective seller of timber. But when we so say we must read into the telegram the thought that the "Twenty million feet of timber available for you" was Blue River timber, for until Gates' arrival, he would not know whose timber might be purchased, as he could well assume the

telegram was in response to his September request to Shroyer to let him know if he "heard of anything good" available for purchase. It was on this second visit of Gates to Canada when he learned for the first time that Shroyer, personally, had no timber to sell and the title to the timber he was offering to sell to Gates was vested in plaintiff Blue River.

It appears that Shroyer's relationship to Blue River was only as a substantial creditor with some responsibilities in connection with its mill operation. Shroyer did have, however, a contract or option to buy Blue River's corporate stock from one W. H. L. Jones, who owned all but three shares[2] of Blue River's 5,280 shares of issued stock. Shroyer did not come into ownership of this stock until about October 1, 1957.

But we observe that from the very beginning of negotiations with Gates to and including their completion, there was an apparent acquiescence on the part of Blue River to follow Shroyer's leadership in the transaction with Gates, even though he was not an officer or stockholder at the time.

■ We have held that negotiations originating out of an application for a loan tend to support a conclusion that a deed given was intended as a mortgage (see *Umpqua Forest Ind. v. Neenah-Ore. Land Co.*, supra (188 Or at 633). However, the converse is equally true, i.e., when the negotiations begin with an offer of sale it tends to support a conclusion that the deed given is in fact a deed absolute and not a mortgage. 1 Jones, supra, 496 § 401; 59 CJS 77, Mortgages § 40.

While in Canada on the second trip, Shroyer and

---

[2] Two of these three shares were held by Jones' relatives and one by F. J. G. Johnson, the corporation's secretary. All had been transferred to them by Jones to qualify the holders as directors.

Gates had a meeting with Hamilton Read, solicitor for Blue River, in his offices in Vancouver, B.C. The date of the first meeting in the solicitor's office is not precisely established. According to the best memory of plaintiffs' witness Johnson, it was close to Christmas Eve, 1955, possibly December twenty-third. There is also some indication that a loan may have been suggested to Mr. Read by Shroyer in lieu of a sale and Mr. Read in anticipation of Mr. Gates' arrival in response to Shroyer's telegram of December nineteenth, had prepared documents to evidence a loan. However, Shroyer admitted on cross-examination that "no definite decision [was] reached as to how the transaction was to be handled until [they] met in Mr. Read's office on January 6 of 1956."

Mr. Johnson, the secretary and director of Blue River, who later executed the various documents in behalf of that plaintiff, testified that on the occasion of the December meeting certain documents were handed to Mr. Gates who read them, and after some discussion, Gates said "he would not accept the documents" and that "he * * * would under no circumstances lend money to Blue River Sawmills, Ltd. or Shroyer * * *." Whereupon, Shroyer said, "Well, go ahead and make it the way he wants it."

Following the first meeting in Mr. Read's office and Gates' refusal to make a loan as reported by Johnson, Gates hastened back to Oregon to consult with his Corvallis attorney, Mr. John D. Thomas. Among other things, Thomas advised him that the transaction would be governed by Canadian law and recommended the retention of Canadian counsel to represent him. He gave Gates a letter under date of January 3, 1956. This letter is in evidence as Exhibit E. It outlines with clear and specific detail just what

Gates should do to protect his deal as "an absolute outright cash purchase[r]" of the Canadian property which he after acquired. The directions given follow the cautious pattern familiar to careful attorneys desirous of protecting the interests of a client soon to lay out a substantial sum of money as a purchaser. It is interesting to note that the Canadian deal was ultimately consummated almost in the exact terms advised by Mr. Thomas in that letter.

Gates quickly returned to Vancouver, where, following the recommendations of his Corvallis counsel, he retained the services of G. W. Lane, a barrister and solicitor, of Vancouver, B.C., to represent him in all subsequent transactions relating to the timber. On January 6, 1956, Gates again met with Blue River's solicitor, Mr. Read, Mr. and Mrs. Shroyer, Mr. F. J. G. Johnson, the officer of Blue River previously referred to, and his own attorney, Mr. Lane.

Apparently, and after the documents were put in final form, Mr. Read said to Mr. Shroyer in the presence of Gates, according to Mr. Johnson:

"A * * * 'Sit down, Mr. Shroyer. I want you to sit down and I want you to sit back and listen to this agreement clause by clause.' He said, 'You realize that by doing this neither Johnson nor I agree to this, but by doing this you are selling this timber to Mr. Gates with an option to purchase back at,' * * * and he [Read] said, 'We don't like it, but if you insist on going ahead, I'll read it out to you.' He then read it out clause by clause, and the documents I believe were then handed to Mr. Gates who said that he would consult with Mr. Lane, his attorney, upstairs. * * *"

Mr. Lane had offices in the same building where Mr. Read's firm officed. He testified at the trial that he was present at the meeting last referred to by

Johnson, i.e., January sixth. Solicitor Lane's account reads:

"Q Who was present at that meeting?

"A There was Mr. Hamilton Read, Mr. Gates, Mr. Johnson and Mr. and Mrs. Shroyer.

"Q Will you relate to the Court what occurred at that meeting in your presence?

"A I went into Mr. Read's office with Mr. Gates and I said to Mr. Read that I understood an agreement had been entered into between Mr. Gates and Blue River Sawmills, Ltd. whereby Blue River Sawmills, Ltd. would sell to Mr. Gates twenty-six[®] timber licenses for $150,000 and would give to Blue River Sawmills an option to repurchase within two years at $300,000 and within a shorter period for $225,000.

"Q And what was said?

"A Mr. Read stated that that was the case, and I asked him to supply me the numbers of the timber licenses involved in the transaction, and he did so, and it was arranged between himself and myself that he would prepare the documents covering the transaction and would submit them to me for perusal on behalf of Mr. Gates.

"Q Was that done?

"A Yes, it was.

\* \* \* \* \*

"Q In the course of handling this transaction did you at any time hear any discussions concerning a loan?

"A I did not."

Notwithstanding the record, the plaintiff Shroyer and his wife claim there was an oral agreement that the transaction was a loan. Generalizing, it would appear that Shroyer had made some effort to convert the transaction from a sale to a loan and this resulted in the preparation of the documents which Gates

---

[®] Three more licenses were subsequently added.

refused to sign, as above reported by Johnson. But Johnson's account of Gates' unequivocal refusal to lend money to the Blue River enterprise, as made in Mr. Read's office in the presence of Mr. and Mrs. Shroyer, in our opinion completely overcomes their long after made representation *that at the time the transaction was consummated it was the mutual intention of the parties, expressed orally, that Gates was in fact making a loan* instead of a purchase. *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* supra (188 Or at 628) (and other citations above to the same point). But neither the Shroyers nor Johnson attempt to say when or where such "oral" agreement was made. We are prompted to ask with whom and for whose benefit was it made? Was it made to Shroyer, who was not a stockholder at that time; or was such agreement made with Blue River, the grantor under the deed and the optionee under the option agreement?

They also rely on the testimony of Johnson. Johnson, however, never made an unequivocal statement to that effect. Jones, Blue River's only stockholder (see footnote 2, supra), took no part in the preliminary negotiations between Gates and Shroyer, nor the conferences had in Mr. Read's office. The sole representative of the plaintiff corporation was Mr. Johnson (as its secretary and one of its directors). He had never met Gates until their first meeting in Read's office late in December, 1955. We think the resolution under which Johnson ultimately executed the various documents speaks more eloquently of the true character of the transaction than what Shroyer, his wife, or Johnson at this time attempt to ascribe to it.

The resolution of the stockholders of Blue River

(Exhibit 1), previously referred to, authorized Johnson to *"sell"* 29 of its timber licenses for $150,000. *It did not authorize Johnson to borrow $150,000 or any other amount on the security of such licenses or otherwise.* We also find that a Canadian firm of chartered accountants examined the books and accounts of Blue River as of September 30, 1956. The report of this firm (Exhibit U) discloses that Blue River's "timber account," consistent with the resolution of authority, carried the deal under review as a "sale" for $150,000 and not as a loan, and in the balance sheet prepared by the accountants one does not find a suggestion of any indebtedness due the defendant Gates.

Hamilton Read, Blue River's solicitor, is the only person, aside from Gates and Shroyer, who attended all of the conferences had in his office. His absence as a witness is accounted for by his letter in evidence addressed to one of plaintiffs' counsel indicating that he was suffering from a severe attack of herpes and, therefore, could not attend the trial which was to begin the following week. We also know him to be an elderly man in his eighties. We assume that if plaintiffs believed his testimony would have supported their contentions, they would have moved to have taken it by deposition or for a continuance of the trial until he recovered. His letter indicates that he had been informed that recovery might possibly be in three weeks thereafter. Their failure to have done either we think is significant.

In addition to the testimony of the Shroyers and Johnson, plaintiffs also rely on a certain admission alleged to have been made by Gates to the witness Lamb and his attorney, Mr. Ainsworth, sometime during the latter part of November, 1957. We will

later give attention to the testimony of the two witnesses mentioned.

We note here that during the course of their negotiations all parties dealt at arm's length. Both the seller and the buyer had their respective attorneys at their sides. Johnson, who represented Blue River in the conferences and Shroyer, as well as Gates, were persons experienced in timber matters. Cf. *Mattes v. Smith,* 149 Or 93, 95, 39 P2d 676 (1935).

Appellants in their brief make the following representation as a rule of law with reference to the option agreement conferring repurchase privileges upon the plaintiff Blue River:

> "A person or a corporation in financial distress when borrowing money, gives as security a deed, absolute on its face, conveying title to real property, and the lender gives back an option to repurchase at a price which amounts to illegal interest, the Courts will construe the transaction as a loan * * *."

 We first note that the proposition urged by appellants calls for the proven presence in the transaction of several different elements: (1) a grantor in "financial distress." This, of course, implies a "distress" which is known to the grantee-lender and which he is presumed to take advantage of to the detriment of the grantor; (2) that the repurchase price is one amounting to "illegal interest" or usury. As to the first item, "financial distress," we shall shortly demonstrate that Gates knew nothing of the financial situation of Blue River or Shroyer beyond the fact that Blue River had a "need for money" and was willing to sell some of its timber to supply that need. Gates paid over his $150,000 for the deed without reserving one dollar for direct payment to any par-

ticular creditor and without any condition as to how said funds would be used by Blue River. Such limitations are not unusual for a lender to do to better secure the status of his loan if he has any knowledge his borrower is in a serious financial condition. As to the second item in their proposition, i.e., that the payments stipulated in the option are in fact a coverage for "illegal interest" or usury, there is no pleading of usury nor was there any tender of proof by plaintiffs that the amounts required for repurchase are in any respect illegal or usurious, either under the laws of Canada, where the subject matter of the deed is situated and where the transaction was consummated, or under the laws of Oregon, where the option was to be exercised. Facts constituting usury must be fully and sufficiently alleged, and the proof thereof must be plain, positive and palpable. *Teshner v. Roome*, 106 Or 382, 401, 210 P 160, 212 P 473 (1923); *Farrell v. Kirkwood*, 69 Or 413, 416, 139 P 110 (1914); 91 CJS 695, Usury § 110. But the fundamental weakness in plaintiffs' thesis about the option is plaintiffs' lack of clear and convincing evidence that the $150,000 received by Blue River was a loan and not a purchase price for the timber conveyed. There can be no usury without a loan.

■ The fact that the deed and option were written and dated the same day presents a circumstance that may be taken into consideration in connection with all the facts, incidents and other circumstances which led to their execution in order to determine the intention of the parties. *Kramer v. Wilson*, 49 Or 333, 337, 90 P 183 (1907).

■ But, standing alone, proof that an option to repurchase may have been given by the grantee to the grantor of the deed coincidentally with the delivery

of the deed, does not furnish conclusive proof, nor necessarily persuasive proof, that the entire transaction was one of loan and not one of sale of the property compelling a declaration that the deed is a mortgage and the option to repurchase is in law a defeasance provision thereof. 1 Wiltsie, Mortgage Foreclosure (4th ed), 13 § 10; *Blackwell v. Johnson,* 127 Or 673, 677, 273 P 332 (1929); 59 CJS 65, Mortgages § 27.

■ Ordinarily, the test to determine whether a deed coupled with an agreement by the grantee to reconvey the property effects a mortgage is whether there is an unsatisfied indebtedness owing the grantee which is enforceable independent of the deed. 1 Wiltsie, supra, 12 § 10. The foregoing rule was applied in *Colahan v. Smyth,* 159 Or 569, 81 P2d 112 (1938). See, also, *Young v. Evans,* 104 Or 619, 624, 208 P 741 (1922).

We have recently held that if there is an agreement to reconvey and the optionor cannot compel repayment, the agreement may be regarded as a conditional sale. *Kohler v. Gilbert,* 216 Or 483, 503, 339 P2d 1102 (1959). See, also, 36 Am Jur 773, Mortgages § 167, and 37 Am Jur 426, Mortgages § 1182. See Anno 155 ALR 1110. The instant option does not commit Blue River to pay any part of the sums therein stipulated for repurchase. Gates has no recourse against the optionee in the event it fails to exercise the privilege therein provided. The absence of a personal debt "raises such a strong natural inference in this sort of a case that the transaction was a sale that it practically establishes the point." Osborne, supra, 185, § 76.

The claim of the plaintiffs that the option agreement operates as a defeasance clause loses some of

its force when it is recalled that Blue River delayed nearly two months before it elected to make the agreement a binding one by payment of the stipulated consideration of $1,000, and this notwithstanding that it had long since received the $150,000 for its deed.

There is no conclusive test of universal application to determine whether a deed, absolute on its face, is a mortgage. *Hewitt v. Baker*, 222 Minn 292, 24 NW2d 47 (1946); 59 CJS 70, Mortgages § 35.

Appellants seek to bolster their position by resort to two familiar tests ofttimes applied in a proceeding of this character when the circumstances seem to justify and claim for them a conclusiveness not warranted. The first one to which we refer relates to the financial embarrassment of the grantor, if any, and under the second test the court may take cognizance of any striking disparity between the amount of the consideration received and the actual value of the property conveyed. Both inquiries, when made, are to discover whether the grantee took an unconscionable advantage of the grantor. They are at the most only aids to judicial inquiry and an affirmative finding on either or both does not necessarily impose upon the court a duty to declare that a deed, absolute on its face, is, in fact, a mortgage. 36 Am Jur 762, Mortgages § 147.

The appellants assert that Shroyer was in "financial distress" and rely upon that as a circumstance for our consideration.

In *Umpqua Forest Ind. v. Neenah-Ore. Land Co.*, supra (188 Or at 633), we quoted with approval the following from 59 CJS 78, Mortgages § 42, as the rule upon which appellants rely:

"If the grantor of a deed absolute in form, but alleged to have been intended as a security, was

financially embarrassed at the time of its execution, being sorely pressed for money and, therefore, at the mercy of his creditor and unable freely to dictate the terms of his security, this circumstance will be considered as tending to show the intention to create a mortgage."

See, also, *Leathers v. Peterson,* supra (195 Or at 77); 1 Jones, supra, 496 § 402.

■ We find nothing in the record disclosing that either the plaintiff Blue River or Shroyer was being sorely pressed for money or at the mercy of any creditor at the time negotiations were had with Gates, except for a few general conclusions advanced by Shroyer to the effect that "we were in need of money"; or "we had to have money," we know no more. We assume that "we" here includes both Shroyer and Blue River, although at the time Shroyer had no title interest in the corporation, and the corporation was the receiver and only beneficiary of the $150,000 produced by Gates.

Many persons and businesses are in need of funds from time to time without being in serious financial distress and the need does not always spring from the demands of impatient creditors. Gates was not one of Shroyer's or Blue River's creditors. He testified that he knew nothing of the financial condition of Shroyer or Blue River beyond the general conclusions of Shroyer, as above quoted, and there is no evidence that it was ever disclosed to him or that he ever attained any further knowledge of their respective financial situations until sometime in the summer of 1956, months after the transaction was closed.

It is reasonable to assume that one making a loan of so substantial a sum as $150,000 would have made

some inquiry to have first discovered the credit standing of his mortgagor, in this instance Blue River, and particularly, the nature and status of its liabilities and its net worth. Such inquiry would be in order to determine Blue River's ability to liquidate its prospective indebtedness to him on its due date, if, in fact, the transaction was a loan. This was not done. On the other hand, Gates, as a prospective buyer, would have no occasion to investigate nor Blue River to reveal these financial details. Even if Gates as a prudent lender had overlooked such an important and usual procedure, his Vancouver attorney certainly would have advised such disclosure from plaintiffs as a condition precedent to the making of any loan.

Concerning the second test relating to the alleged disparity, we have held the adequacy of the price is a circumstance which may be considered. *Leathers v. Peterson,* supra (195 Or at 75, 77); *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* supra (188 Or at 635); *Elliott v. Bozorth,* supra (52 Or at 404); 59 CJS 77, Mortgages § 41.

Reliance on that proposition constitutes a substantial part of appellants' argument. It also accounts for most of the evidence tendered in plaintiffs' behalf. They would have the court believe that the timber conveyed to Gates had a value of "at least $750,000" at the time of the transaction. We are not so convinced nor do we believe there was any substantial disparity between $150,000 and its true market value at the time the parties consummated their deal, a time when all timber values were falling. The court is of the opinion that plaintiffs failed to produce any competent evidence of the amount of stumpage upon which any sound calculation of value could be made. But even if such a record had been

made, any value predicated thereon in terms of the then current market price for merchantable timber of quality grade would have to be heavily discounted because of the geographical location of the timber and its inferior grade. We shall not attempt to particularize, but rather generalize our reasons for these conclusions.

The testimony offered by plaintiffs to show the quantity of timber on the 29 timber licenses acquired by Gates has little or no probative value. The evidence tendered was either not based on accurate or thorough cruises or represented averages computed from three or four previous cruises, such as the Lacey cruise of 1911, the Eustice Smith cruise of 1937 (limited to seven licenses), the Foran cruise of 1953, and the Milburn cruise of 1954 (limited to 10 licenses only), or came from witnesses wanting in qualifications for purposes of estimate, or, as in one instance, the circumstances under which information for estimate was obtained were such as to render it of doubtful value.

Plaintiffs depend upon the testimony of the following persons to support their stumpage claims. The plaintiff Shroyer, who when asked on direct examination how much timber was on the 29 licenses, answered, he did not know. Johnson, as plaintiffs' witness, when asked the same question, gave a similar answer, but added he could supply "a very conservative estimate." When given this opportunity, it developed Johnson's "estimate" was based on a complex of the four previous cruises above mentioned. The appellants point to the testimony of defendants' witness Matheson, but here again we find that this witness had never personally cruised the areas of defendants' timber licenses and was relying on the

same hearsay data that Johnson depended upon for his estimate.

They also cite us to the testimony of Lamb. Lamb's stumpage figure is based primarily on an airplane view which did not take him "over all of it" but, as he says, "over a substantial portion." From this and a very limited ground inspection, he was asked to venture an estimate on the quantity of timber, but demonstrated he did not know precisely the volume of timber on the licenses held by Gates. He added, "I was shown no lines and I would not attempt to say just how many of these sections [of Gates'] that I did see, although I must have seen them all, I flew over the country, and I saw these licenses along with other timber." It will be recalled that Blue River at that time still owned 19 sections or licenses of the 50 it had originally acquired. They were all more or less contiguous to the 29 previously sold to Gates.

The record as to the quantity of timber on the areas bought by Gates is so vague and nebulous, so wanting in character, entitling it to admission or credence, that we cannot, unless we engage in sheer speculation, arrive with reasonable certainty at any figure that would warrant holding that the licenses acquired by Gates had any given number of board feet.

But even if we were able to establish such a figure, the market value of the timber would have to be substantially discounted by reason of other matters evident from the record. This conclusion rests upon two very adverse factors: the first relates to the unique geographic location of the Blue River properties, a circumstance materially increasing the cost of production in that locale; the other results from the

defective or low grade character of a large part of the timber found in the licensed areas held by Gates.

We learn that most of the 29 units purchased by Gates stretch from the town of Blue River in a southwesterly direction along and close to the course of the stream known as Blue River. They extend along its course for a distance of about 12 or 14 miles, or even more. This narrow river valley is described as a hollow "U" and varies from a quarter to a half mile in width with steep hills on both sides. The valley floor is very swampy, a reflection of the wet climate in that area, where there is an annual precipitation varying from 30 to 40 inches in the lower altitudes to 100 inches in the higher reaches. Five full months of the year there are below freezing temperatures with a "very heavy load of snow."

Much of the foregoing comes to us from defendants' witness Matheson, a graduate forester and forest engineer, of British Columbia, a person of wide experience in that province, and familiar with the timber and terrain in the area of the Blue River holdings.

Matheson stated that because of the clay soil and not much gravel at hand, the expense of building roads is "very high." The extreme weather conditions shorten the logging season very considerably. Logging is further complicated by the alternate freezing and thawing of the roads produced by Chinook winds, thus disintegrating such roads as one might otherwise have. He also advises that there was not yet "a first or even a second-class highway into that area." Johnson, likewise, speaks disparagingly of the roads: "The trouble is the mud. That's what you've got to watch in that country, the wet interior belt."

From Matheson we are told of great fluctuations

in the flow of the river due to rain or run-off of snow in large quantities which add to the expense of an operation. It was his observation that the weather also has an impact on living conditions. This is confirmed by the witness Wilt, infra. In response to the following question, Matheson summarized his testimony in these words:

> "Q Do you have an opinion as to whether or not there is a greater than average risk and hazard involved in falling and logging of timber in the Blue River area?
>
> "A Yes, I would say that there is a—there's definitely a higher hazard than almost anywhere else in the Province of British Columbia."

On cross-examination he again spoke to the same effect: "* * * I feel that the Blue River area is one of the most difficult logging operating areas in the Province of British Columbia." No one came forward to contradict any of the representations made by Mr. Matheson or the witness Wilt, whose testimony supported Matheson.

Johnson, who will be remembered as the secretary of Blue River, tells us that the licenses in issue "are mostly situated in the poorer timber that contains the most cedar and hemlock which are defective," and again speaks of "the hemlock and cedar [as] very poor material" and "unmarketable." He says, "comparatively," there is not a great quantity of white pine or fir. Even plaintiffs' witness Lamb, when asked if he knew that "the hemlock and cedar is rotten and defective," answered: "In places, yes, I certainly do." And so, too, was the testimony of Shroyer and Matheson concerning this defective character. Some idea of the spread of the various kinds of timber is obtained through Matheson, who

estimated that the whole was "approximately 30% spruce, 30 to 35% cedar, and the other volumes [fir and pine] are in a minor amount to make up the difference." Thus, it would appear that 60 to 65 per cent of the whole stand was defective.

The witness Stanley Wilt had had long experience in the purchase and resale of timber and logging in northern California, Oregon, Washington and British Columbia, and in the latter area from 1949 to 1954. Wilt, in 1954, had inspected what are now the holdings of Gates with a view to purchasing them for a logging and sawmill operation. He spent five days examining this timber on foot and two days flying over it in a helicopter and by airplane. His description of the terrain, roads, weather conditions and quality of the timber follows closely that given by the other witnesses. Wilt tells us that from a logger's standpoint it was tough and expensive country to operate in and difficult to get good men in there to work that kind of a show. He adds that the river is not adaptable to the transportation of logs. All in all, he regarded it as a very risky investment. Considering the cost of roads and logging, the timber he saw had what he called a "minus value."

Thus, it would appear that the timber for a logging venture was anywhere from a "minus value" to the price Mr. Gates paid for it. Certainly, there is no evidence which justifies us in holding that there was any great disparity or, indeed, any disparity, between the price Blue River actually received and its true worth.

In terms of the quantity and value of the timber held by Gates, the appellants have failed to supply clear and convincing evidence.

Earlier we made reference to the accountant's re-

port (Exhibit U). In it is an interesting item relating to the subject of value. We find in that report that as of September 30, 1955 (three months prior to the instant transaction), Blue River was the owner of 50 timber licenses. These were carried on its books at a value of $201,021.62. This is apparently the original cash cost figure to which certain cruising costs were added. From the $201,021.62 the accountants deduct $124,633.40. This last figure represents that part of the original cost of the 50 licenses borne by 31 licenses sold subsequent to September 30, 1955. One sale was for two licenses sold December 21, 1955, to Diamond Mills, Ltd., for $60,000, and the other for the 29 licenses sold to Gates for $150,000, and as stated in the report, "in respect of 30 million feet of certain species thereon." Thus, on the basis of this accounting record, Blue River enjoyed a gross profit from these two sales of $85,366.60, the greater portion of which is attributable to its transaction with Gates. This advantage, incidentally, accrued during a period of a falling market for timber in British Columbia. We do not hold that "book value" or cost figures are necessarily synonymous with "market value" of a later date, but suggest that in this matter it is a circumstance strongly tending to negative the claim of plaintiffs of the existence of a shocking or any disparity between the $150,000 paid by Gates and the actual value of the timber he acquired.

It has been held that the payment of taxes by the grantee on the property after the execution of the deed is a circumstance tending to show that the grantee considered himself the owner of the property and tends to negate the concept that the instrument was a mortgage. 59 CJS 80, Mortgages § 45; Osborne, supra, 186, § 76; 5 Tiffany, supra, 263, § 1396.

. This Canadian property was subject to various duties and charges payable to different agencies of the government. There was, for example, an annual renewal fee of $100 on each timber license, a charge to the "Forest Protection Fund," and a separate timber tax, and possibly others. Mr. Gates on different dates during the years 1956 and 1957 made direct payment to the governmental collectors of a total of $17,191.43, distributed as follows: to renewal fees, $5,830 (including a $30 penalty); to the Forest Protection Fund, $2,067.48; and to timber taxes, $9,293.93. Appellants make no claim that these payments were made pursuant to any agreement with them or as a condition to what they call a "loan."

Earlier we have made several references to the witness Lamb, of Ashland, Oregon, and his testimony relating to the extent of the Blue River forests. We now give attention to his visit on November 27, 1957, with Mr. Gates in his lumber yard office, in Corvallis, Oregon. With Lamb at the time was his attorney, S. E. Ainsworth, also of Ashland.

Mr. Lamb is a lumberman of 30 or more years' experience. It appears that sometime during the summer of 1957 he became interested in the Blue River operation as a possible personal investment. After visiting the premises in August or September of that year and making an "on foot" and airplane survey of the holding, he entered into two agreements at the same time in October. One was with Jones, and the other with Shroyer. Each contemplated an escrow of all the corporate stock and other instruments which would become Lamb's after a series of installment payments. The aggregate of the obligations of both was $200,000. Lamb testified he made these engagements without a prior title search, with-

out knowing Gates held the record title to 29 timber licenses, and without investigating the escrow arrangement subsisting between Gates and Blue River:

Apparently, Lamb did not examine Blue River's books of account, for had he done so he would have seen book entries reporting the corporation's deal with Gates as a "sale" of 29 timber licenses. He did say, however, he had been told by Shroyer, Jones and Johnson that it was a "loan" and not a "sale." In reliance upon that representation and without any inquiry of Gates, Lamb made a payment to Jones of $50,000 in October when executing his stock purchase agreement.

Under the circumstances, we are not surprised Lamb was seeking out Gates to discover "what it would take to settle this matter * * * and see what could be done about it." Lamb's anxiety to conclude an arrangement, to use his phrase, no doubt evidences a discovery made sometime after closing his deal with Shroyer and Jones in October that Blue River owned 29 timber licenses less than he had been led to believe.

The conference with Gates in his office that day in November ran for two or three hours, beginning; as said by Ainsworth, with an hour or so of small talk and generalities before they reached the subject of Mr. Lamb's real mission. It was during the latter phase of their conference that Mr. Lamb says Gates described his transaction with Blue River as a "loan."

Justice LORD's words of admonition in *Stephens v. Allen,* supra (11 Or at 196), appeal to us as peculiarly applicable when evaluating what Lamb and Ainsworth attribute to Gates in the conversation had with him nearly two years after his Canadian deal was

consummated. It is to the effect that declarations or admissions should be closely scrutinized and weighed with caution on account of the possibility of witnesses misapprehending the language used and the difficulty of correctly repeating its import. See, also, *Burnett v. Lemon,* 185 Or 54, 62, 199 P2d 910 (1949), where the substance of what was said in the *Stephens* case was repeated in these words: "Oral admissions are to be viewed with caution. In many instances the person testifying to such alleged admissions may have misunderstood what was said and give a meaning completely at variance with what the party actually intended." We think that the foregoing statement from the *Burnett* case, supra, finds exemplification in the instant matter, for although saying that Gates had referred to his business with Blue River as a "loan," Ainsworth with no little significance voluntarily added: "I think he tended to call it an investment more than anything else." The word "investment" comprehends the investing of money for income or profit and is equally descriptive of a purchase or a loan.

Gates categorically denied that he had in the November conference with Lamb and Ainsworth denominated his transaction with Blue River as a "loan." Lamb reports when he pressed Gates for "some arrangement," he replied, "* * * he didn't know just what could be done about it, the papers were up at the bank and they spoke for themselves, as far as he knew; that he [Lamb] might go up and pay in the money called for and obtain the papers at any time."

■ The assertions of Lamb and Ainsworth that Gates referred to his Canadian deal as a "loan" and Gates' emphatic denial required the trial court to re-

solve the conflict in terms of relative credibility of the witnesses before him. This he very evidently determined in favor of Gates. The trial judge's superior advantage in a matter of this kind with his opportunity to see and hear the witnesses and note their demeanor on the stand inclines us to accept his judgment as very persuasive. *Reeves v. Dickenson,* 208 Or 360, 364, 300 P2d 458 (1956); *Hughes v. Kay,* 194 Or 519, 523, 242 P2d 788 (1952).

We hold that plaintiffs have failed to meet the heavy burden cast upon them to demonstrate with clear, convincing and consistent evidence that the deed to Gates, absolute on its face, was in fact a mortgage.

No reference was earlier made in this opinion to the subject of jurisdiction for the reason that it was not raised by any party to this appeal nor is there anything in the record disclosing that it was ever given any consideration by the trial court on its own motion. But we are moved to comment thereon because of a supplemental brief filed by the plaintiffs. Notwithstanding that brief does not approach the matter as we do, it verges close enough in our opinion to warrant the observations which follow.

There is only one place in the complaint where there is any specific reference to the character of the property which is the subject of the suit. This is in paragraph V. So far as pertinent, it reads:

"That heretofore and during the month of January, 1956, the Plaintiff, Blue River Sawmills, Ltd., owned and had under its control twenty-nine (29) perpetual timber licenses, which, in effect, was and is the right to cut timber perpetually on substantially six hundred forty (640) acres of land per timber license, * * * which

said timber licenses represent timber owned by the Canadian Government, and which Government by the license gives each owner of the license the right to log the timber upon said timber license tract of land; that said licenses are numbered and are listed as follows: * * *."

■ The jurisdiction of the court in *Dippold v. Cathlamet Timber Co.,* 98 Or 183, 193 P 909, was challenged for the first time in this court. There, we said at p 191:

"We recognize the rule that when a complaint reaches this court without having been demurred to or moved against in any way, every reasonable inference or intendment should be invoked to support it: [citing cases]."

In so doing we give the language of a pleading its reasonable and ordinary meaning and import (41 Am Jur 336, Pleading § 69; 71 CJS 145, Pleading § 58) and take judicial notice of the significance of all legal expressions as established by law (ORS 41.410(1) and (2)). Although not too artfully done, we find that the allegations of paragraph V describe a license which relates to real property without creating any interest therein.

■ It is a matter of universal acceptance that: "A license in respect of realty is an authority to do an act on the land of another *without possessing any estate in the land,* and is to be distinguished from a grant or demise creating some interest in the property." (Emphasis supplied.) 53 CJS 806, Licenses § 79; 33 Am Jur 398, Licenses § 91.

This court, in *McCarthy v. Kiernan,* 118 Or 55, 245 P 727 (1926), adopted the same definition. See, also, *Forsyth v. Nathansohn,* 139 Or 632, 633, 9 P2d

1036 (1932); *Strandholm v. Barbey,* 145 Or 427, 441, 26 P2d 46 (1934); *Christensen v. Borax Co.,* 26 Or 302, 304, 38 P 127 (1894); *Stinson v. Hardy,* 27 Or 584, 589, 41 P 116 (1895); *Schiffman v. Hickey,* 101 Or 596, 601, 200 P 1035 (1921); *Klein v. Portland,* 106 Or 686, 693, 213 P 147 (1923). Thus, even if the complaint had been limited to the words "timber licenses," it would have conveyed the concept of personalty instead of realty.

In 1956, in *Crook v. Curry County,* 206 Or 350, 292 P2d 1080, at p 353, we quoted with approval the following statement from 54 CJS 730, Logs and Logging § 29:

> "'A license to cut timber and remove it does not give any estate, right, or title in the land on which the licensee is permitted to cut; nor does it, prior to actual severance, vest title to the timber in the licensee, although a valuable consideration has been paid.'"

*Anderson v. Moothart,* 198 Or 354, 256 P2d 257 (1953), involved a timber license and is authority for the proposition that a timber licensee takes no interest in the land and only takes a property interest in the trees when the same are cut.

The universality above claimed for the definition of a license with respect to real property and its emphasis on the lack of any title in the realty by licenses enjoys acceptance both in Canada and England. *Naegele v. Oke,* 31 DLR 501, 504 (1916); *Kerr v. Connell (New Brunswick),* 2 Berton 233 (1836); *The New Brunswick and Nova Scotia Land Co. v. Kirk,* 1 Allen 443, 450 (1849); *Breckenridge v. Woolner,* 3 Allen 303, 305 (1856). The last three cases relate to timber licenses. See, also, 23 Halsbury,

Laws of England (3d ed) 430, re "The Nature of a License."[4]

Even if we assume, for the purpose of argument, that the timber licenses as pleaded disclose an interest in real property in Canada, it does not follow in a suit of this kind that our courts are divested of jurisdiction.

■ A court of equity having jurisdiction over the parties, as here, may administer full relief without regard to the nature or situation of the property involved, and may compel action with respect to land which lies beyond its jurisdiction, as by conveyance thereof, provided it can enforce its decree by the exercise of its powers over the person before it. 30 CJS 441, Equity § 82; 19 Am Jur 53, Equity § 25.

The principle upon which this jurisdiction rests is that chancery, acting *in personam* and not in rem, holds the conscience of the parties bound without regard to the situs of the property. *Lindley v. O'Reilly,* 50 NJL 636, 15 A 379, 381; 30 CJS, supra, at 442.

This court has long since been committed to this rule of equitable jurisdiction. In *Johnston v. Wads-*

---

[4] Although we have given no weight to the evidence in arriving at our foregoing conclusions, it is interesting to note that the substantive provisions of the 29 timber licenses, which were in evidence and are a part of the record in this matter, support our conclusions concerning the character and sufficiency of the allegations found in paragraph V. It appears therefrom that they were issued in 1912 pursuant to the "Land Act" of British Columbia and confer upon the licensee the right "to cut, fell, and carry away timber upon all that particular tract of land" in each license referred to. We also note that the "duration of [each] licence is for one year" but "renewable from year to year as provided by * * * subsection (3a) of section 57" of the "Land Act." The subsection relates to the payment of annual renewal fees. We also note that Section 59 of the "Land Act" as it was at the time of the issuance of the instant licenses defined the rights of the licensee in these words:

"The special licence shall vest in the holder thereof all rights of property whatsoever in all trees, timber, and lumber cut within the limits of the licence during the term thereof, whether the trees, timber, and lumber are cut by authority of the licensee, or by any other person with or without his consent, * * *."

*worth,* 24 Or 494, 34 P 13 (1893), Mr. Justice LORD, speaking for the court, said at p 498:

> "* * * As a general rule it is not necessary in equity that the subject-matter of a suit should be corporeally within the jurisdiction of the court, provided that the parties are in person within the jurisdiction, so that they can be personally summoned to answer the complaint; hence the rule that where the court has jurisdiction of the proper parties, it may compel them to do equity in relation to lands located without its jurisdiction in another county or state: Tiedeman, Equity Jurisprudence, § 475. * * *"

In *Berger v. Loomis,* 169 Or 575, 131 P2d 211, 144 ALR 636 (1942), equity properly exercised its jurisdiction in personam to require, at the suit of a judgment creditor, one to whom land in Illinois had been transferred in fraud of creditors, to convey it to a receiver to sell and pay the judgment out of the proceeds.

More recently jurisdiction to extend the remedy of rescission of a contract to convey land in Canada has been established in this state in *Macomber v. Waxbom,* 213 Or 412, 415, 325 P2d 253 (1958), and wherein the court declared the suit as one in personam and transitory. By reference to our files we find that the complaint in that case disclosed on its face that the contract involved related to "real property in British Columbia, Canada."

A suit, such as the instant one, is treated as a suit to redeem and not as an action based on fraud or reformation. 59 CJS 98, Mortgages § 58; *Zivotosky v. Max,* 190 Misc 1044, 75 NYS2d 553, 555; *Adair v. Adair,* 22 Or 115, 134, 29 P 193 (1892).

Equity's embracement of a suit to have a deed

absolute declared to be a mortgage, notwithstanding the property involved is land in a foreign jurisdiction, is not a novel one. *Reed v. Reed,* 75 Me 264, 269 (where the land was situate in Wisconsin); *Clark v. Seagraves,* 186 Mass 430, 71 NE 813, 816 (where the land was situate in Ohio).

The decree of the circuit court is affirmed.

ROSSMAN, J., dissenting.

At the very outset we must determine whether or not the Oregon courts have jurisdiction to grant the relief which the plaintiffs seek. The subject matter of the suit is an extensive timber domain, 18,560 acres in extent which is situated in the Province of British Columbia, Dominion of Canada. The plaintiffs want the Oregon courts to hold that an instrument on file in the Province of British Columbia which describes the timber domain just mentioned and which purports to be "an absolute conveyance," that is, a deed, is nothing more than a mortgage. Thus, the Oregon courts are asked by their decree to affect the title to the timber just mentioned.

The exact nature of the right which the plaintiffs conveyed to the defendants and for which they seek a reconveyance is not disclosed by the record. It is clear, however, that it is a perpetual right and that it governs not only timber which is now growing but timber which may germinate in the years—in fact, centuries—to come. The complaint refers to the rights as timber licenses but it avers that the plaintiff, in making his conveyance to the defendants, employed an instrument known as "an absolute conveyance." No citation to authority is needed to warrant the statement that the word "conveyance" denotes the transfer of an interest in land. The meaning of that

word is stated as follows in 18 CJS, Conveyances, page 91:

> "* * * In its strict legal sense, the term imports a transfer of legal title to land, but in the popular sense of the term, and as it is generally used by lawyers, it denotes any transfer of title, legal or equitable. As a technical or quasi-technical term, it is a word of precise and definite import, comprehending the several modes of passing title to real estate * * *."

Not only did the plaintiffs employ "conveyances" when they transferred their title to the defendants but the latter, in order to make provision for a retransfer to the plaintiffs upon the latter's repayment of the sums borrowed, executed "reconveyances." For example, the complaint states:

> "That all of said conveyances as hereinabove described, were delivered to the said Defendants Gates; that reconveyances were executed by the Defendants Gates and placed in escrow in the United States National Bank * * * to be delivered to the Plaintiff, Blue River Saw Mills, Ltd., upon the payment of said loan * * *."

It is clear that since the plaintiffs possessed a perpetual right which included timber to be grown in the distant future that they had a license with an interest; that is, an interest in the growing trees. Since unfelled trees are realty, the plaintiffs had an interest in the realty.

In determining whether or not a court possesses jurisdiction over a cause it takes note of only the averments of the complaint and not of the evidence which may subsequently be admitted. It is the averments of the complaint that confer jurisdiction if the court has jurisdiction at all. That such is the law is

well established. For example, *Watts v. Gerking*, 111 Or 641, 222 P 318, 228 P 135, said:

> "It is well to observe while passing that—'Jurisdiction always depends upon the allegations, and never upon the facts. * * * The truth of the allegations does not constitute jurisdiction.' Van Fleet's Collateral Attack, § 60."

Substantially the same statement had been made previously in *Dippold v. Cathlamet Timber Co.*, 98 Or 183, 193 P 909, in which this court quoted the following from *Eagle Cliff Fishing Co. v. McGowan*, 70 Or 1, 137 P 776:

> "The authority of a court to hear and determine a cause depends upon the allegations of the initiatory pleading, and not upon the facts."

See to like effect *McDonough v. Southern Or. Mining Co.*, 177 Or 136, 159 P2d 829, 161 P2d 786.

A preceding paragraph mentions some of the averments of the complaint. The prayer asks, among other items, for the following relief: "That it be adjudged and decreed that after the payment of the money herein specified, that the Defendants Gates have no title or interest in or to said timber licenses described in this complaint, or any of the property of the Plaintiff, Blue River Saw Mills, Ltd."

The prayer is never disregarded when a court determines whether or not it has jurisdiction. Obviously, if the prayer asks for something that the court can not grant it must decline to take jurisdiction. In any event, if the averments of the complaint are doubtful or ambiguous the court looks at the prayer. For example, in *O'Brien v. Fitzgerald*, 143 NY 377, 38 NE 371, the court declared:

> "* * * that relief as asked must necessarily solve the doubt, because there is no other solution. * * *"

We see from the foregoing that a conveyance of the perpetual right to the timber growing upon a very large area in the Province of British Columbia is the subject matter of this proceeding. We held in *Anderson v. Moothart,* 198 Or 354, 256 P2d 257: "A sale of standing timber is the sale of an interest in real property."

There is involved in this suit not only the timber that was upon the land when the parties had their transaction, but also the timber which will sprout up and grow to maturity in the years to come. That timber was owned by the plaintiffs. They conveyed it to the defendants. The trees have not been severed from the soil. Timber attached to the soil and growing in it is real property—so we held in the case from which I quoted in the preceding paragraph.

We are required to believe, from the complaint, that the conveyances which are involved in this proceeding grant the right not only to the removal of the timber but also the title to the timber itself. Otherwise, the word "conveyance" would not have been employed in describing the rights involved in this proceeding. We must also bear in mind that the right is a perpetual one.

The title to the timber aforementioned is manifested by an instrument which the complaint mentions as "an absolute conveyance" and is on file in the public records of the Province of British Columbia. The prayer asks that we change the nature of that instrument from one that purports to be a deed and hold it to be nothing more than a mortgage. In other words, we are asked to insert in the instrument on file in British Columbia a defeasance clause. It seems very clear that an Oregon court has no juris-

diction by its decree to affect the title to property in a foreign land.

The following is taken from 21 CJS, Courts, § 70, page 105:

> "* * * Plaintiff must plead and prove the foreign law under which he claims, and that he had a cause of action thereunder in the state having such law."
>
> \* \* \*
>
> "The statute of the states where the cause of action accrued should be set out in the declaration or complaint, and plaintiff must be prepared to show the law of the state under which he claims the right asserted by him and that he had a cause of action which the courts of the state in which such cause of action accrued under their view of the law at the time of such accrual, would have enforced."

The complaint makes no averment along that line. It is therefore deficient in an element needed to confer jurisdiction.

It is said, but not by the parties, that the following decisions deal with timber licenses of the same kind with which this proceeding is concerned and that they indicate that the rights involved in this proceeding did not in any way affect the title to real property. *Crook v. Curry County*, 206 Or 350, 292 P2d 1080; *Naegle v. Oke*, 31 D.L.R. 501; *Kerr v. Connell*, 2 Berton 233; *New Brunswick v. Kirk*, 1 Allen 843; *Breckenridge v. Woolner*, 3 Allen 303.

*Crook v. Curry County*, supra, denotes the point it decided in the following passage which we take from it:

> "The reservation contained in the deed to the plaintiff does not reserve to the lumber company

any or all of the timber standing upon the land, but merely the right for a period of five years to go upon the land to take and remove the timber involved.

"The law is well settled that a mere reservation of a right to remove timber from land creates a license and not an estate in the land or timber."

Those facts are so different from those involved in this proceeding that no comment is needed. In that case an individual was granted the right for a period of five years to go upon a tract of land and remove timber. In the case now before us there was transferred by an instrument termed "an absolute conveyance" a perpetual right to the timber produced upon a large area of land and to remove it. In the Crook case the right did not encompass timber not yet in existence.

*Naegle v. Oke,* supra, was an action by an individual who had the right to take water from his neighbor's land for a period of years against the successor in interest of the neighbor to establish the plaintiff's right to the water and for damages. The issue presented was what rights did the plaintiff acquire. The decision ruled that the plaintiff acquired a personal license and since he had sold the property he had no enforceable rights.

*Kerr v. Connell,* supra, was an action in trover by a holder of a one year timber license to cut 200 tons of white pine against a holder of a timber license to cut birch. Both licenses were for the same term and on the same land. In defining the plaintiff's rights, the court determined that he did not have any rights in the standing timber and said that a "license in these terms (to cut and to remove) clearly amounts

to a *grant* of the timber which may be *cut and removed according to the terms of the license* but of *no more.* It conveys no title whatever to any timber which is *not cut and removed* by virtue of the license." 238-239.

*New Brunswick v. Kirk,* supra, was an action by the grantor of a five year timber license against the assignee of the licensee to recover rent. It was determined that the license conferred no interest in the land but only a right to cut and carry away timber.

*Breckenridge v. Woolner,* supra, was an action by a holder of a one-year timber license against a trespasser for cutting and taking timber. The court held the suit was not maintainable since the plaintiff had only a right to cut and remove the trees.

I do not believe that those decisions which were concerned with short terms are decisive of this case. If either the plaintiffs or the defendants wished it established that the Oregon courts had jurisdiction to insert a defeasance clause in the Canadian deed, and thereby convert it into a mortgage, the necessary averments should have been made.

But, if the court holds that it has the required jurisdiction I do not believe that the evidence presented by the defendants overcomes that of the plaintiffs which tends to show that the deed, absolute in form, was a mortgage. In suits of this kind we are not at liberty to disregard the established rules of evidence but are required to conform to them. Evidence, whether presented by a plaintiff or a defendant, which shows the negotiations that preceded the drafting and execution of the document must be deemed merged therein. I believe that the plaintiffs' evidence established that the transaction was a mort-

gage and that the defendants were not at liberty to seize upon occasional statements made in the preceding negotiations for the purpose of showing that a deed, and not a mortgage, was in the minds of the parties. The evidence establishes that the defeasance clause was somehow omitted from the deed.

I dissent.